## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| STAFFORD SHEEHAN, | |
| Plaintiff, | |
| -against- | C.A. No.: |
| AIR COMPANY HOLDINGS, INC., | **Jury Trial Demanded** |
| Defendant. | |

## COMPLAINT

Plaintiff, Dr. Stafford Wheeler Sheehan ("Dr. Sheehan" or "Plaintiff"), by and through his undersigned counsel, asserts this action against Defendant Air Company Holdings, Inc. ("ACH" or the "Company"), and states as follows:

### NATURE OF THE ACTION

1.    Dr. Sheehan, the former Chief Technology Officer ("CTO") and co-founder of Defendant ACH, brings the instant action in order to hold the Company accountable for its egregious misconduct in unlawfully terminating his employment, purportedly for "Cause," in retaliation for his engaging in protected whistleblowing activity.

2.    After Dr. Sheehan had been sounding the alarm for weeks about serious compliance, contractual and regulatory violations at ACH, ACH abruptly placed Dr. Sheehan on a purported leave of absence, and then terminated him for cause, purportedly due to his management style and other pretextual reasons, including Dr. Sheehan's supposed breach of the confidentiality obligations he owed ACH pursuant to a Proprietary Information agreement.  After Dr. Sheehan (through counsel) approached ACH's counsel in an effort to determine whether a mutually acceptable resolution of their dispute could be reached short of litigation, and with

knowledge that Dr. Sheehan was poised to bring the instant whistleblower action, ACH's counsel expressed a willingness to mediate. However, ACH then stalled on moving forward with mediation while surreptitiously preparing to beat Dr. Sheehan to the courthouse via the filing of an anticipatory bad faith and meritless action for declaratory and other relief in Delaware Chancery Court. In so doing, ACH seeks to recast what is properly viewed as an employment dispute involving the retaliatory discharge of a whistleblower who worked in New York, at ACH's Brooklyn headquarters, under the protection of the New York labor laws—and for which Dr. Sheehan has a right to a jury trial—into a corporate governance dispute under Delaware law. This Court should not reward ACH's gamesmanship, and the instant dispute should proceed in this Court without further delay.

3.    In or about 2016, Dr. Sheehan, a scientist and inventor with a degree in Chemistry from Boston College, and a Ph.D. in Physical Chemistry from Yale University, invented and began to develop technology for converting carbon dioxide and water into a usable fuel that can be produced on-site while also reducing greenhouse gases. Beginning in 2019 and continuing over the next five years, he assigned the portfolio of his fuel technology patents to ACH, a company he co-founded. Dr. Sheehan was employed as the CTO of ACH from August 2017 until his unlawful termination on December 30, 2024, and served as a director of the Company from October 2020 until on or about January 9, 2025.

4.    During the course of his employment and throughout his service as a director, Dr. Sheehan continually (i) acted in good faith, in what he reasonably believed was in the best interest of the Company, (ii) responded truthfully to due diligence and other questions from investors (who were subject to non-disclosure agreements and confidentiality obligations) based on information available at the time, and (iii) negotiated with potential investors with the full knowledge and

involvement of key stakeholders involved with the operations of the ACH Board (the "Board"), including the Chairman of the Board, Steven Jbara ("Mr. Jbara"), the Chief Executive Officer, Gregory Constantine ("Mr. Constantine"), certain Board directors, and others in management. Indeed, Dr. Sheehan's actions were consistent with the Board's express direction, as is confirmed by contemporaneous communications with Mr. Jbara and other directors, as well as by the actions taken by Mr. Jbara and other directors.

5.    Despite his repeated efforts to improve ACH, including its internal controls relating to compliance with government contracts and regulations, Dr. Sheehan was fired by the Company in retaliation for bringing the Company's violations of regulations governing controlled information to the attention of both members of the Board and the federal authorities, as described below.

6.    Plaintiff's employment relationship with ACH is governed by New York law. In addition, the Proprietary Information Agreement entered into by Dr. Sheehan specifies application of New York law.

7.    As CTO of the Company, Plaintiff received valuable compensation and benefits in connection with his employment.  Moreover, through the course of Plaintiff's employment, Plaintiff was a Participant in two non-statutory Stock Option Agreements pursuant to which he was granted the right to purchase shares of Common Stock in the Company (the "Option Agreements") (Exs. 1-2).  As set forth herein, as a result of Plaintiff's unlawful termination for purported "Cause," Plaintiff was stripped of his rights under the Option Agreements to the tune of tens of millions of dollars in addition to suffering other substantial damages.

## THE PARTIES

8.    Plaintiff Stafford Sheehan is a natural person, and a citizen of, and domiciled in, the State of Rhode Island.

9.    Defendant ACH is a Delaware corporation with its principal place of business at 407 Johnson Avenue, Brooklyn, New York 11206-2805.

## JURISDICTION AND VENUE

10.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332, as there is diversity of citizenship between Plaintiff and Defendant and the amount in controversy exceeds $75,000.

11.    Venue is proper pursuant to 28 U.S.C. § 1391(b)(2), as a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in the Eastern District of New York, as further set forth herein.

## JURY TRIAL DEMANDED

12.    Plaintiff demands a trial by jury on all issues so triable.

## STATEMENT OF THE CASE

13.    Defendant ACH is an engineering company founded by Dr. Sheehan in 2017 that, in layman's terms, utilizes Dr. Sheehan's patented technology to convert carbon dioxide and water into "jet fuel."

14.    The ability to convert carbon dioxide and water into "jet fuel" on- site attracted the attention of the National Aeronautics and Space Administration ("NASA"), the Department of Defense ("DoD"), the DoD's Defense Innovation Unit ("DoD's DIU") and the National Science Foundation ("NSF").

15.    Due to the sensitive nature of ACH's work and its contracts with the government, ACH is subject to significant compliance-related obligations.

16.     At various times throughout the relevant period, ACH's Board began engaging in conduct which Dr. Sheehan believed was putting ACH at risk of contractual, regulatory and criminal liability stemming from (i) what appeared to be misappropriation of funds from federal government contracts, (ii) unauthorized dissemination of government-controlled information to foreign nationals,  (iii) unauthorized sharing of restricted information with Chinese companies, and  (iv) knowingly making false statements to government counterparts.  Dr. Sheehan brought these concerns to the Board which responded with resistance, denial and anger.

17.     Certain directors and officers, as well as the representatives of certain venture capital funds resisted ACH investing the time and expense necessary to implement proper controls or address compliance-related issues when they occurred.  Rather than take the steps necessary to ensure no security lapses occurred, such individuals instead pushed ACH to illegally retaliate against Dr. Sheehan for raising his concerns.

18.     Dr. Sheehan engaged in protected whistleblower activity on at least four separate occasions, reporting several significant compliance violations to the CEO and the Chairman of the Board who did nothing to stop or remediate the violations.  Dr. Sheehan also refused to follow a Board directive that he make knowingly false statements to the Company's federal-agency counterparties which included NASA, the DoD, the DoD's DIU and the NSF.

19.     In retaliation for Dr. Sheehan reporting these and other unlawful or improper matters, ACH's Board placed Dr. Sheehan on an involuntary administrative leave, and then terminated his employment, allegedly for cause, and stripped him of his directorship. By mischaracterizing his termination as for cause, ACH, among other things, deprived Dr. Sheehan of his right to exercise vested stock options which have a fair market value of tens of millions of

dollars, as well as subjected him to severe reputational harm and other damages. He would, in other words, be illegally forced out of the Company he co-founded.

<u>ACH Violations of Government Contracts</u>

20.    ACH has a contract with the DoD, through the DoD's DIU, whereby ACH agreed to provide the DoD with the technological capability to convert carbon dioxide into jet fuel for U.S. military and civilian aircraft. Pursuant to DoD policy and federal law and regulations, all information and materials relating to the contract are considered Controlled Unclassified Information ("CUI"),[1] for which there are required safeguards concerning its dissemination.

21.    Under the terms of ACH's contract with the DoD, certain ACH proprietary information, CUI, and Export Controlled Information ("ECI")[2] shall not be disseminated to foreign

---

[1] As established by 32 C.F.R § 2002.14 and Exec. Order No. 13556, 3 Fed. Reg. 68675 (2010), all holders of CUI must follow standardized procedures for safeguarding the controlled information as specified by law and the government contracting agency in order to protect national security interests and nonproliferation objectives. *See* DoD CUI Program, https://www.dodcui.mil/Export-Control/Export-Controlled/.

The DoD defines Controlled Unclassified Information ("CUI") as unclassified information that requires safeguarding and dissemination controls in accordance with laws, regulations, government-wide policies and/or agency-wide policies. U.S. Dep't of Def. Instr. No. 5200.48, Controlled Unclassified Information (CUI) §§ 2,5 (March 6, 2020). An "unclassified disclosure" is defined as a "[c]ommunication or physical transfer of classified or controlled unclassified information to an unauthorized recipient." U.S. Dep't of Def. Man. No. 5200.01-V2, Glossary (Feb. 24, 2012).

[2] ECI is a subcategory of CUI. 22 C.F.R §§ 120-130, known as the International Traffic in Arms Regulations ("ITAR") and 15 C.F.R. §§ 730-774, known as the Export Administration Regulations ("EAR"), "establish policies and procedures" for safeguarding controlled information and consider "any release or disclosure of controlled technology or technical data to any foreign person, whether it occurs in the United States or abroad, [to be] deemed an export, requiring either an export license or authorization for disclosure." U.S. Dep't of Def. Instr. No. 2040.02, International Transfers of Technology, Articles and Services, encl. 4 (Mar. 27, 2014). Moreover, "[c]ontrolled technology or technical data is considered to be released or disclosed when information is transferred to foreign persons by means of: (1) a visual inspection, (2) an oral exchange . . . (4) the use of any other medium of communication, including but not limited to electronic, magnetic, or laser technology." *Id.* The procedures under ITAR and EAR apply to "[f]oreign persons visiting with U.S. DoD contractors." *Id.*

nationals without proper authorization. Moreover, because ACH's contract with the DoD involves technology that creates jet fuel for U.S. military aircraft, the federal government considers all such information and material relating to the contract to be controlled information, meaning it is subject to additional safeguards concerning dissemination because its "export could reasonably be expected to adversely affect the United States national security and nonproliferation objectives." *Export Controlled*, DoD CUI Program, https://www.dodcui.mil/Export-Control/Export-Controlled/. [3]

22.    ACH also has government contracts which specifically prohibit ACH from "contracting to participate, collaborate, [or] coordinate bilaterally in any way with China or a Chinese-owned company using funds appropriated on or after April 25, 2011."

23.    Under Section 3.5 of U.S. Department of Defense Instruction ("DoDI") 5200.48, ACH is required to report any unauthorized dissemination of CUI and/or ECI to the DoD. Moreover, Section 1.2 of DoDI 5200.48 requires that "[a]ll DoD CUI must be controlled until authorized for public release in accordance with DoD Instructions."

24.    Dr. Sheehan's responsibilities included overseeing ACH's various government contracts and his direct reports included the Directors of Government & Defense, Operations, IT & Security, and Regulatory Affairs.  Indeed, he was identified as the Principal Investigator ("PI")

---

[3] The DoD CUI Program states that export-controlled information includes "items identified in export administration regulations, international traffic in arms regulations and the munitions list." *Export Controlled*, DoD CUI Program, https://www.dodcui.mil/Export-Control/Export-Controlled/.  ACH's technology is considered a Category V munition, Explosives and Energetic Materials, Propellants, Incendiary Agents, and Their Constituents under 22 C.F.R. § 121.1. Specifically, ACH's technology falls under Category V(i), which includes "[d]evelopmental . . . fuels . . . or precursors therefor funded by the Department of Defense via contract or other funding authorization" as well as Category V(j), covering "[t]echnical data . . . and defense services directly related to the defense articles described in paragraphs (a) through (i) of this category." 22 C.F.R. § 121.1 (g)(8)(2)(i) and (j).

on ACH's key contracts with its customers, including NASA and the NSF.  In this role, Dr. Sheehan served as the primary liaison between ACH and its customers, and had a duty to ensure any funds were used appropriately, as well as a duty to notify customers of any potential compliance-related issues.

25.    Until Dr. Sheehan's involuntary placement on administrative leave in October 2024, Dr. Sheehan and other ACH employees,[4] were working diligently with the DoD's DIU to develop more robust information controls at ACH. During this time, Dr. Sheehan and other employees warned ACH's CEO and Board members that the Company's information controls were insufficient and implementation of additional controls should be prioritized ahead of other initiatives within the Company, such as fundraising and marketing. However, Board members, including Mr. Constantine in particular, dismissed their concerns and deprioritized the implementation of the controls urged by Dr. Sheehan and other employees.

Dr. Sheehan Reports Misappropriation of Government Funds

26.    Around late April 2024, while reviewing expenses for ACH's federal awards, Dr. Sheehan noticed that some expenses appeared to be allocated to unallowable marketing costs, which is not authorized under any of ACH's government contracts.  This suggested  funds were being mismanaged or misappropriated. Dr. Sheehan reported his concerns to Mr. Jbara, the Chairman of ACH's Board, on April 30, 2024.

27.    The next day, Dr. Sheehan submitted an e-mail memo to the Company's Board, escalating his concerns regarding mismanagement/misappropriation of federal funds. Based on

---

[4] One of these employees resigned from ACH on October 15, 2024, after refusing the Board's request to deliver a scripted message to the DoD that materially misrepresented Dr. Sheehan's status at ACH following Dr. Sheehan's placement on involuntary leave from the Company.

information available to Dr. Sheehan through October 5, 2024, he is unaware of any action the Board took to address the mismanagement and misappropriation of federal funds that he flagged in his May 1, 2024 memo.  To Dr. Sheehan's knowledge, the Board still has not taken any appropriate action to address these issues.

<u>Dr. Sheehan Reports Improper Disclosures by Lubo Zhou</u>

28.     In or around April 2023, around the time Dr. Sheehan began vocalizing his concerns about vulnerabilities in ACH's information controls, a customer relayed concerns to Dr. Sheehan about ACH's Vice President of Research, Development, and Engineering, Lubo Zhou ("Dr. Zhou"). The customer informed Dr. Sheehan that it had identified Dr. Zhou as a security risk and was concerned that he was sharing government-controlled information with Chinese nationals and Chinese corporations. Dr. Sheehan notified Mr. Constantine, Mr. Jbara, and Arthur Souritzidis ("Mr. Souritzidis"), another member of ACH's Board, again emphasizing the need for increased information controls. Dr. Sheehan continued to raise this issue for months thereafter, but ACH failed to investigate or take action.

29.     In or around September 2024, several ACH employees informed Dr. Sheehan that Dr. Zhou was sharing proprietary engineering information with foreign companies, Dr. Zhou included in a presentation a cost estimate obtained from Dr. Zhou's contacts at Wison Engineering ("Wison"), a Chinese[5] engineering corporation. For Wison to make such an estimate, it would have needed certain technical information related to ACH's government contracts. Dr. Sheehan was concerned that some of the information shared was CUI and ECI.

---

[5] The national origin of the corporation is relevant due to the applicable governing regulations and contractual provisions.

30.    Because the dissemination of any such information would violate multiple federal regulations and ACH's contractual obligations to the DoD and NASA, as well as pose a danger to national security interests, Dr. Sheehan informed Mr. Constantine, Mr. Jbara and other directors about his concerns. Dr. Sheehan also contacted ACH's designated security contact at the DoD's DIU, to keep the contracting office briefed of the situation.

<u>Dr. Sheehan Reports a Security Breach at ACH</u>

31.    On September 23, 2024, a group—invited by Mr. Constantine—that was affiliated with the World Economic Forum, toured ACH's 94 Scott facilities. The group was brought into one of ACH's controlled laboratory areas that contained proprietary information, CUI and ECI. The tour group included foreign nationals.

32.    In accordance with DoDI 5200.48, the Company was required to seek authorization *prior* to allowing any foreign nationals to enter the controlled laboratory area because it contained proprietary and controlled information.[6]

---

[6] ACH's Contract with the DoD states: "The Parties agree that research findings and technology developments arising under this Agreement may constitute a significant enhancement to the national defense, and to the economic vitality of the United States. Accordingly, access to important technology developments under this Agreement by Foreign Firms or Institutions must be carefully controlled. The controls contemplated in this Article are in addition to, and are not intended to change or supersede, the provisions of the International Traffic in Arms Regulations (22 C.F.R. Part 120, *et seq.*), the National Industrial Security Program Operating Manual (NISPOM) (DoD 5220.22-M), and the Department of Commerce's Export Administration Regulations (15 C.F.R. Part 730, *et seq.*)." It also states: "Each Party agrees to comply with U.S. Export regulations including, but not limited to, the requirements of the Arms Export Control Act, 22 U.S.C. §§ 2751-2794, including the International Traffic in Arms Regulation (ITAR), 22 C.F.R. § 120 et seq.; and the Export Administration Act, 50 U.S.C. § 4601 et seq., formerly located at 50 U.S.C. app. § 2401- 2420. Each party is responsible for obtaining from the Government export licenses or other authorizations/approvals, if required, for information or materials provided from one party to another under this Agreement. Accordingly, the company shall not export, directly, or indirectly, any products and/or technology, Confidential Information . . . ."

33.     Dr. Sheehan discovered the foreign nationals in unauthorized areas of the 94 Scott lab when he arrived at the facility later that day. He observed members of the group taking photographs and video in the unauthorized area of the lab. Dr. Sheehan immediately instructed the photographers and videographers to stop documenting and directed the tour group toward authorized areas of the facility.  He was informed that the tour had been organized by one of ACH's marketing employees. After speaking with the marketing employee, that employee confirmed that Mr. Constantine had made the final approval for the visit.

34.     Later on September 23, 2024, Dr. Sheehan called ACH's external counsel to inform him that there had been an unauthorized visit by foreign nationals during which proprietary information, CUI and ECI were potentially exposed and documented.

35.     Dr. Sheehan also reported the incident to Mr. Jbara.  During their conversation, Mr. Jbara did not indicate that he shared Dr. Sheehan's level of urgency, thus leading Dr. Sheehan to believe Mr. Jbara would do nothing to address this security breach, much like Mr. Jbara had shrugged off Dr. Sheehan's report alerting him to Dr. Zhou's improper sharing of proprietary and government-controlled information.

36.     Dr. Sheehan called ACH's designated security contact at the DoD's DIU later that afternoon and reported the security breach to the DoD's DIU in order to comply with ACH's contractual and regulatory obligations, and to prevent additional harm resulting from the incident.

37.     On September 24, 2024, ACH held a leadership meeting where it was discussed that Dr. Sheehan reported the security breach at the 94 Scott lab. Although the company indicated that it would investigate, Dr. Sheehan is not aware of any corrective action ACH took as a result of the incident.

38.     On September 26, 2024, three days after Dr. Sheehan reported this latest security breach relating to the unauthorized visit, the Company's Board informed Dr. Sheehan that it was moving forward with a "Leadership Review" which had been recently suggested by a director.

39.     On information and belief, the Leadership Review was conducted in a manner as to produce negative results regarding Dr. Sheehan as pretext for placing him on leave in retaliation for his reporting of several security breaches. The results of the Leadership Review were never shared with Dr. Sheehan in writing, instead, he was told orally that he needed to improve his management style.

40.     On September 30, 2024, Dr. Sheehan formally informed the DoD's DIU of the security breach in writing.

41.     That same day, the CEO of a key investor requested and met with Dr. Sheehan to discuss the recent events at ACH, including but not limited to the recent security breach. The investor's CEO did not express concern regarding the incident, and instead implied that Dr. Sheehan should have reported the incident to Mr. Constantine, ACH's CEO (to whom Dr. Sheehan did not report within the organization), rather than to ACH's designated security contact at the DoD's DIU and/or outside counsel, and by failing to do so, Dr. Sheehan had allegedly engaged in insubordination.

<u>The Government escalates Dr. Sheehan's report of security violations</u>

42.     On October 1, 2024, DoD's DIU escalated Dr. Sheehan's report of the 94 Scott incident to the U.S. Air Force Office of Special Investigation ("OSI").

43.     On October 3, 2024, an OSI Special Agent contacted Dr. Sheehan to discuss his report. OSI informed Dr. Sheehan that OSI intended to refer the matter to the Export Enforcement Division of Homeland Security to further address the security breach.

<u>Dr. Sheehan Refuses to Make False Statements and</u>
<u>ACH Places Dr. Sheehan on Administrative Leave</u>

44.    On October 4, 2024, upon learning that the DoD's DIU had escalated Dr. Sheehan's report to OSI, Mr. Jbara emailed Dr. Sheehan and instructed him to stay away from ACH's premises. The next morning, October 5, 2024, Mr. Jbara suspended Dr. Sheehan's access to his company email without prior notice. Dr. Sheehan took no steps to prevent Mr. Jbara from accessing his emails, nor did he instruct anyone at ACH to try to prevent such access.

45.    On October 6, 2024, the Board held an "emergency" meeting. Dr. Sheehan, as a Board member and per ACH's bylaws, was entitled to notice of this meeting, but such notice was not properly delivered to him. At the Special Meeting, the Board voted to place Dr. Sheehan on involuntary administrative leave of absence until January 1, 2025 and continued suspending Dr. Sheehan's access to his ACH email.

46.    Later that day, Mr. Jbara sent Dr. Sheehan a letter instructing him to refrain from communicating with any of the Company's employees, customers, investors or potential investors during his leave. The letter was sent in the evening of October 6, 2024, but back-dated to October 5, 2024.

47.    On October 16, 2024, ACH, through counsel, asked Dr. Sheehan to reach out to "key DoD contacts, business partners, and employees," via phone or text, but not via his work email, which he still could not access. ACH sent a draft "script" of talking points outlining what Dr. Sheehan should say. The script contained false information, instructing Dr. Sheehan to state he thought investors and customers were in "extremely capable hands" with ACH's new Chief Operating Officer ("COO"), a person Dr. Sheehan has never worked with because that individual

was hired while Dr. Sheehan was on leave. The script also falsely conveyed that Dr. Sheehan *voluntarily* took a leave to "recharge."

48. On October 18, 2024, Mr. Jbara texted Dr. Sheehan asking if ACH's lawyer had sent over the scripted "talking points for DoD." Dr. Sheehan replied that he would not deliver those talking points because that would be "lying to the federal government." Mr. Jbara replied, "Ok good feedback for me to know!"

49. Dr. Sheehan's reporting of (i) the apparent misappropriation of government funds, (ii) Dr. Zhou's disclosures of proprietary and controlled information to a Chinese engineering firm, (iii) the security breach, and (iv) his refusal to convey a misleading message to ACH's government counterparties, are all protected activities under New York's whistleblower statute (N.Y. Lab. Law § 740). Under sections 2(a) and 2(c), ACH'S retaliation against Dr. Sheehan is illegal.

<u>ACH Terminates Dr. Sheehan</u>

50. On December 30, 2024, ACH held a Special Meeting during which ACH terminated Dr. Sheehan's  employment, allegedly for cause. Notice and the meeting were timed so that Dr. Sheehan would be unable to change his international travel schedule and thus would not be able to attend the meeting.

51. ACH did not notify Dr. Sheehan regarding the basis for ACH's  determination that his termination was "for cause," nor did ACH interview him in connection with any purported investigation.

52. Because ACH mischaracterized Dr. Sheehan's involuntary termination "for cause" in retaliation for his whistleblowing activity, he lost his right to exercise options granted to him under the Option Agreements. These options are worth tens of millions of dollars and once exercised, represent significant equity in ACH.

53.     By placing Dr. Sheehan on an involuntary leave, excluding him from Board meetings, and terminating him for cause (depriving him of his valuable vested stock options with a fair market value of tens of millions of dollars, among other damages), ACH engaged in retaliatory conduct against Dr. Sheehan for his engaging in protected whistleblower activity.

## COUNT I
## Unlawful Termination/Retaliation
(New York Labor Law Section 740)

Plaintiff incorporates by reference each and every allegation previously made herein as if the same were fully set forth.

54.     Dr. Sheehan had a reasonable belief that the misappropriation of federal funds was improper, breached Company contracts with government agencies, violated federal law, and posed a danger to public safety by endangering national security interests.

55.     Dr. Sheehan informed Mr. Jbara and subsequently the Board of Directors of the misappropriation. The Board of Directors had the authority to take corrective action regarding the misappropriation.

56.     Based on Mr. Jbara and the Board's inaction, Dr.  Sheehan reasonably believed that ACH would not report the misappropriation to the DoD's DIU and the government would not have the opportunity to mitigate or remediate the misappropriation if he did not report it himself.

57.     Dr. Sheehan's reporting of the misappropriation to the Board and to DoD's DIU is protected activity.

58.     Additionally, Dr. Sheehan had a reasonable belief that the access granted by Mr. Constantine to foreign nationals, including allowing them to take photographs and videos while within ACH's facilities which contained controlled information, including areas specifically marked as off-limits and containing CUI and ECI was improper, breached Company contracts with

government agencies, violated federal law, and posed a danger to public safety by endangering national security interests.

59.    Dr. Sheehan informed Mr. Jbara of the security breach. As Chairman of the Board, Mr. Jbara had authority to take corrective action regarding the security breach.

60.    Based on Mr. Jabra's remarks and past behavior when informed of a security breach, and the Board's inaction in response to such incidents, as well as Mr. Jbara and the Board's inaction in this instance, Dr.  Sheehan reasonably believed that ACH would not report the security breach to the DoD's DIU and the government would not have the opportunity to mitigate or remediate the security breach if he did not report it himself.

61.    Dr. Sheehan's reporting of the security breach to the Board and to the DoD's DIU is protected activity.

62.    Further, Dr. Sheehan had a reasonable belief that Dr. Zhou's dissemination of protected information containing CUI and ECI to Chinese foreign nationals was improper, breached Company contracts with government agencies, violated federal law, and posed a danger to public safety by endangering national security interests.

63.    Dr. Sheehan informed Mr. Jbara, Mr. Constantine, and other directors about Dr. Zhou's improper disclosures.

64.    As Chairman of the Board and CEO of ACH, Mr. Jbara and Mr. Constantine had authority to take corrective action.

65.    Based on ACH's past inaction in response to information control deficiencies and Mr. Jbara and Mr. Constantine's lack of concern in response to being alerted of these violations, Dr. Sheehan reasonably believed that ACH would not report the improper disclosures to the DoD's

DIU and the government would not have the opportunity to mitigate or remediate the security breach if he did not report it himself.

66.    Dr. Sheehan's reporting of Dr. Zhou's disclosures to the Board and to the DoD's DIU is protected activity.

67.    Additionally, Dr. Sheehan had a reasonable belief that conveying a misleading message to ACH's government counterparties was improper, breached Company contracts with government agencies, violated federal law, and posed a danger to public safety by endangering national security interests.

68.    Dr. Sheehan's refusal to participate in such conduct is protected activity.

69.    In direct response to Dr. Sheehan's protected activity, ACH took retaliatory actions. ACH placed him on administrative leave, and upon receiving notification of potential litigation from Dr. Sheehan's counsel, placed Dr. Sheehan on a three-month involuntary leave of absence. On December 30, 2024, ACH terminated Dr. Sheehan, purportedly for cause.

70.    Dr. Sheehan was an employee at-will and the Board could have terminated his employment for any lawful reason or no reason. By improperly characterizing his termination as for cause, he lost the right to exercise stock options with a fair market value of tens of millions of dollars, and was subjected to other damages by being forced out of the company he co-founded.

71.    ACH's retaliation against Dr. Sheehan is prohibited under New York law. As a direct and proximate result of Defendant's retaliatory conduct, Dr. Sheehan has suffered and will continue to suffer significant injury, including to his business and professional reputation, and his current and future employment opportunities, as well as substantial financial harm. Dr. Sheehan is entitled to an order of reinstatement and damages in the amount of all lost wages, stock options, benefits and other remuneration.

72.     The Court should also award attorney's fees pursuant to N.Y.L.L. § 740(5)(e) and punitive damages pursuant to N.Y.L.L. § 740(5)(g), on the basis that the actions taken by ACH were willful, malicious and/or wanton.

**COUNT II**
**Breach of Contract**
(Non-Statutory Stock Option Agreements)

73.     Plaintiff incorporates by reference each and every allegation previously made herein as if the same were fully set forth.

74.     On December 31, 2019, as a Participant in the Non-Statutory Stock Option Agreement, Dr. Sheehan executed the 2019 Non-Statutory Stock Option Agreement.

75.     Moreover, on August 5, 2021, as a Participant in the Non-Statutory Stock Option Agreement, Dr. Sheehan executed the 2021 Non-Statutory Stock Option Agreement.  The 2019 and 2021 Non-Statutory Stock Option Agreements are collectively referred to herein as the "Option Agreements."

76.     The Option Agreements are valid and enforceable contracts and are governed by the laws of the State of Delaware.  *See* Ex. 1 at § 9; Ex. 2 at § 9.

77.     The 2019 Non-Statutory Stock Option Agreement granted Dr. Sheehan options to purchase up to 2,911,000 shares of ACH stock for $1.06 per share, a considerable discount from its current fair market value.  Moreover, the 2021 Non-Statutory Stock Option Agreement granted Dr. Sheehan options to purchase up to 50,505 shares of ACH stock for an exercise price of $0.99 per share, a considerable discount from its current market value.

78.     According to the terms of each of the Option Agreements, if Dr. Sheehan is terminated for cause, he "shall have no right to exercise this Option upon such termination." *See* Ex. 1 at § 3(e); Ex. 2 at § 3(e).

79.     In terminating Dr. Sheehan's employment for cause for an improper purpose in retaliation for his whistleblowing activity, ACH also cancelled his options granted as a Participant in the Option Agreements, in breach of those Agreements.

80.     In the alternative, by terminating Dr. Sheehan's employment for "cause" where no cause existed, ACH breached the Option Agreements.

81.     As a direct and proximate result of Defendant's breach, Dr. Sheehan has lost the ability to exercise his options to purchase shares of ACH stock currently valued at tens of millions of dollars. As a Participant in the Non-Statutory Stock Option Plan, Dr. Sheehan is entitled to recover from ACH the damages flowing directly from ACH's breach.

### COUNT III
### Breach of the Covenant of Good Faith and Fair Dealing
(Non-Statutory Stock Option Agreements)

82.     Plaintiff incorporates by reference each and every allegation previously made herein as if the same were fully set forth.

83.     On December 31, 2019, Dr. Sheehan was granted options to purchase up to 2,911,000 shares of ACH stock for the Grant price of $1.06 per share.

84.     On August 5, 2021, Dr. Sheehan was granted options to purchase up to 50,505 shares of ACH Stock for the Grant price of $0.99 per share.

85.     Under Delaware law, the covenant of good faith and fair dealing is implied in all contracts and precludes one party to a contract from intentionally acting to deprive another party to the contract the fruits of the bargain struck.

86.     By terminating Dr. Sheehan for cause in retaliation for his protected whistleblowing activity, ACH acted intentionally to inequitably deny Dr. Sheehan of the benefit of the bargain struck in the Option Agreements.

87.    In the alternative, by terminating Dr. Sheehan for "cause" where no cause existed, ACH acted intentionally to inequitably deny Dr. Sheehan the benefit of the bargain struck in the Option Agreements.

88.    As a direct and proximate result of Defendant's action, Dr. Sheehan has lost the option to purchase in excess of 2,911,000 shares of ACH stock, which have a fair market value of tens of millions of dollars, among other damages. Dr. Sheehan is entitled to recover from ACH the damages flowing directly from ACH's deliberate breach of the covenant of good faith and fair dealing.

**WHEREFORE**, Plaintiff respectfully prays that:

i.    The Court enter an order declaring Dr. Sheehan's involuntary leave and eventual termination unlawful and retaliatory in violation of New York Whistleblower protections under N.Y. Lab. Law § 740 and awarding statutory damages including, enjoining Defendant from further retaliating against Dr. Sheehan for engaging in protected whistleblower activity; ordering ACH to immediately reinstate Dr. Sheehan to the same position he held before he was terminated and as Board member at ACH; awarding compensation for lost wages, benefits, and other remuneration; attorney's fees; a civil penalty of ten thousand dollars; and punitive damages.

ii.    The Court enter an order finding that ACH breached the Option Agreements with Dr. Sheehan and awarding to Dr. Sheehan the fair market value of his options or compelling Defendant to restore Dr. Sheehan's options; and

iii.    The Court award such other and further relief as the Court deems just and proper.

Dated:  February 18, 2025                    Respectfully submitted,

                                             */s/ Joni S. Jacobsen*

                                             **DECHERT LLP**
                                             Joni S. Jacobsen
                                             Three Bryant Park
                                             1095 Avenue of the Americas
                                             New York, NY 10036
                                             (212) 698-3680
                                             joni.jacobsen@dechert.com

                                             Bina M. Peltz
                                             Cira Centre
                                             2929 Arch Street
                                             Philadelphia, PA 19104
                                             (215) 994-2236
                                             bina.peltz@dechert.com

                                             *Counsel for Plaintiff Stafford Sheehan*