## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| STAFFORD SHEEHAN,<br><br>                Plaintiff,<br><br>   v.<br><br>AIR COMPANY HOLDINGS, INC.,<br><br>               Defendant. | Case No. 1:25-CV-00932-ARR-PK<br><br><br>**DEFENDANT'S ANSWER TO COMPLAINT, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS** |

Defendant, Air Company Holdings, Inc. ("Defendant" or "ACH" or "AirCo"), by and through its undersigned counsel, hereby submits this Answer in response to the Complaint ("Complaint") of plaintiff Stafford Sheehan's ("Plaintiff or "Sheehan" or "Mr. Sheehan").

### NATURE OF ACTION

1.  Dr. Sheehan, the former Chief Technology Officer ("CTO") and co-founder of Defendant ACH, brings the instant action in order to hold the Company accountable for its egregious misconduct in unlawfully terminating his employment, purportedly for "Cause," in retaliation for his engaging in protected whistleblowing activity.

**RESPONSE:** AirCo admits that Sheehan is a former officer and director of the Company. AirCo denies that any action the Company has taken was made in retaliation for Sheehan's "engaging in protected whistleblowing activity." To the extent a further response is required, except as expressly admitted, denied.

2.  After Dr. Sheehan had been sounding the alarm for weeks about serious compliance, contractual and regulatory violations at ACH, ACH abruptly placed Dr. Sheehan on a purported leave of absence, and then terminated him for cause, purportedly due to his management style and other pretextual reasons, including Dr. Sheehan's supposed breach of the

confidentiality obligations he owed ACH pursuant to a Proprietary Information agreement. After Dr. Sheehan (through counsel) approached ACH's counsel in an effort to determine whether a mutually acceptable resolution of their dispute could be reached short of litigation, and with knowledge that Dr. Sheehan was poised to bring the instant whistleblower action, ACH's counsel expressed a willingness to mediate. However, ACH then stalled on moving forward with mediation while surreptitiously preparing to beat Dr. Sheehan to the courthouse via the filing of an anticipatory bad faith and meritless action for declaratory and other relief in Delaware Chancery Court. In so doing, ACH seeks to recast what is properly viewed as an employment dispute involving the retaliatory discharge of a whistleblower who worked in New York, at ACH's Brooklyn headquarters, under the protection of the New York labor laws—and for which Dr. Sheehan has a right to a jury trial—into a corporate governance dispute under Delaware law. This Court should not reward ACH's gamesmanship, and the instant dispute should proceed in this Court without further delay.

**RESPONSE:**  AirCo admits that the Board of AirCo placed Sheehan on involuntary administrative leave and then later terminated Sheehan for Cause. AirCo admits expressing a willingness to mediate. AirCo denies stalling on moving forward with mediation while "surreptitiously preparing to beat Dr. Sheehan to the courthouse via the filing of an anticipatory bad faith and meritless action for declaratory and other relief in Delaware Chancery Court." AirCo admits that it filed for declaratory and other relief in Delaware Chancery Court. To the extent a further response is required, except as expressly admitted, denied.

3.    In or about 2016, Dr. Sheehan, a scientist and inventor with a degree in Chemistry from Boston College, and a Ph.D. in Physical Chemistry from Yale University, invented and began to develop technology for converting carbon dioxide and water into a usable fuel that can be

produced on-site while also reducing greenhouse gases. Beginning in 2019 and continuing over the next five years, he assigned the portfolio of his fuel technology patents to ACH, a company he co-founded. Dr. Sheehan was employed as the CTO of ACH from August 2017 until his unlawful termination on December 30, 2024, and served as a director of the Company from October 2020 until on or about January 9, 2025.

**RESPONSE:** AirCo admits the allegations of Paragraph 3, except denies that Sheehan's termination was unlawful. To the extent a further response is required, except as expressly admitted, denied.

4.    During the course of his employment and throughout his service as a director, Dr. Sheehan continually (i) acted in good faith, in what he reasonably believed was in the best interest of the Company, (ii) responded truthfully to due diligence and other questions from investors (who were subject to non-disclosure agreements and confidentiality obligations) based on information available at the time, and (iii) negotiated with potential investors with the full knowledge and involvement of key stakeholders involved with the operations of the ACH Board (the "Board"), including the Chairman of the Board, Steven Jbara ("Mr. Jbara"), the Chief Executive Officer, Gregory Constantine ("Mr. Constantine"), certain Board directors, and others in management. Indeed, Dr. Sheehan's actions were consistent with the Board's express direction, as is confirmed by contemporaneous communications with Mr. Jbara and other directors, as well as by the actions taken by Mr. Jbara and other directors.

**RESPONSE:** AirCo denies the allegations of Paragraph 4.

5.    Despite his repeated efforts to improve ACH, including its internal controls relating to compliance with government contracts and regulations, Dr. Sheehan was fired by the Company in retaliation for bringing the Company's violations of regulations governing controlled

information to the attention of both members of the Board and the federal authorities, as described below.

**RESPONSE:** AirCo denies the allegations of Paragraph 5.

6.    Plaintiff's employment relationship with ACH is governed by New York law. In addition, the Proprietary Information Agreement entered into by Dr. Sheehan specifies application of New York law.

**RESPONSE:**  The allegations in Paragraph 6 are legal conclusions to which no response is required.  The Proprietary Information Agreement is a written agreement that speaks for itself.

7.    As CTO of the Company, Plaintiff received valuable compensation and benefits in connection with his employment. Moreover, through the course of Plaintiff's employment, Plaintiff was a Participant in two non-statutory Stock Option Agreements pursuant to which he was granted the right to purchase shares of Common Stock in the Company (the "Option Agreements") (Exs. 1-2). As set forth herein, as a result of Plaintiff's unlawful termination for purported "Cause," Plaintiff was stripped of his rights under the Option Agreements to the tune of tens of millions of dollars in addition to suffering other substantial damages.

**RESPONSE:**  Defendant denies the allegations of Paragraph 7, except admits that Sheehan was a Participant in two non-statutory Stock Option Agreements, which are written documents which speak for themselves.

**THE PARTIES**

8.    Plaintiff Stafford Sheehan is a natural person, and a citizen of, and domiciled in, the State of Rhode Island.

**RESPONSE:**  AirCo admits the allegations of Paragraph 8.

9.    Defendant ACH is a Delaware corporation with its principal place of business at 407 Johnson Avenue, Brooklyn, New York 11206-2805.

4

**RESPONSE:** AirCo admits the allegations of Paragraph 9.

<u>**JURISDICTION AND VENUE**</u>

10.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332, as there is diversity of citizenship between Plaintiff and Defendant and the amount in controversy exceeds $75,000.

**RESPONSE:** Paragraph 10 states legal conclusions to which no response is required.

11.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(2), as a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in the Eastern District of New York, as further set forth herein.

**RESPONSE:** Paragraph 11 states legal conclusions to which no response is required.

<u>**JURY TRIAL DEMANDED**</u>

12.     Plaintiff demands a trial by jury on all issues so triable.

**RESPONSE:** AirCo admits that Plaintiff demands a jury trial.

<u>**STATEMENT OF THE CASE**</u>

13.     Defendant ACH is an engineering company founded by Dr. Sheehan in 2017 that, in layman's terms, utilizes Dr. Sheehan's patented technology to convert carbon dioxide and water into "jet fuel."

**RESPONSE:** AirCo admits the allegations of Paragraph 13, except denies that Dr. Sheehan *alone* founded the Company and denies the possessive characterization of "Dr. Sheehan's patented technology". To the extent a further response is required, except as expressly admitted, denied.

14.     The ability to convert carbon dioxide and water into "jet fuel" on- site attracted the attention of the National Aeronautics and Space Administration ("NASA"), the Department of

Defense ("DoD"), the DoD's Defense Innovation Unit ("DoD's DIU") and the National Science Foundation ("NSF").

**RESPONSE:** AirCo admits the allegations of Paragraph 14.

15.    Due to the sensitive nature of ACH's work and its contracts with the government, ACH is subject to significant compliance-related obligations.

**RESPONSE:** AirCo admits it has certain agreements with the government. To the extent a further response is required, except as expressly admitted, denied.

16.    At various times throughout the relevant period, ACH's Board began engaging in conduct which Dr. Sheehan believed was putting ACH at risk of contractual, regulatory and criminal liability stemming from (i) what appeared to be misappropriation of funds from federal government contracts, (ii) unauthorized dissemination of government-controlled information to foreign nationals, (iii) unauthorized sharing of restricted information with Chinese companies, and (iv) knowingly making false statements to government counterparts. Dr. Sheehan brought these concerns to the Board which responded with resistance, denial and anger.

**RESPONSE:**  AirCo denies the allegations of Paragraph 16.

17.    Certain directors and officers, as well as the representatives of certain venture capital funds resisted ACH investing the time and expense necessary to implement proper controls or address compliance-related issues when they occurred. Rather than take the steps necessary to ensure no security lapses occurred, such individuals instead pushed ACH to illegally retaliate against Dr. Sheehan for raising his concerns.

**RESPONSE:**  AirCo lacks the information necessary to confirm or deny what representatives of certain venture capital funds did or did not do.  To the extent a further response is required, except as expressly admitted, denied.

18.    Dr. Sheehan engaged in protected whistleblower activity on at least four separate occasions, reporting several significant compliance violations to the CEO and the Chairman of the Board who did nothing to stop or remediate the violations. Dr. Sheehan also refused to follow a Board directive that he make knowingly false statements to the Company's federal-agency counterparties which included NASA, the DoD, the DoD's DIU and the NSF.

**RESPONSE:** Paragraph 18 offers legal conclusion to which no response is required. To the extent a further response is required, except as expressly admitted, denied.

19.    In retaliation for Dr. Sheehan reporting these and other unlawful or improper matters, ACH's Board placed Dr. Sheehan on an involuntary administrative leave, and then terminated his employment, allegedly for cause, and stripped him of his directorship. By mischaracterizing his termination as for cause, ACH, among other things, deprived Dr. Sheehan of his right to exercise vested stock options which have a fair market value of tens of millions of dollars, as well as subjected him to severe reputational harm and other damages. He would, in other words, be illegally forced out of the Company he co-founded.

**RESPONSE:** AirCo denies the allegations of Paragraph 19, except admits that Sheehan was placed on an involuntary administrative leave, and then terminated for Cause.

<u>ACH Violations of Government Contracts</u>

20.    ACH has a contract with the DoD, through the DoD's DIU, whereby ACH agreed to provide the DoD with the technological capability to convert carbon dioxide into jet fuel for U.S. military and civilian aircraft. Pursuant to DoD policy and federal law and regulations, all information and materials relating to the contract are considered Controlled Unclassified Information ("CUI"),[1] for which there are required safeguards concerning its dissemination.

---

[1] As established by 32 C.F.R § 2002.14 and Exec. Order No. 13556, 3 Fed. Reg. 68675 (2010), all holders of CUI must follow standardized procedures for safeguarding the controlled

**RESPONSE:** AirCo's contract with the DoD is a written agreement which speaks for itself. AirCo admits it has a contract with the DoD. The statutes and regulations contained in the footnote are written documents which speak for themselves. To the extent a further response is required, except as expressly admitted, denied.

21.     Under the terms of ACH's contract with the DoD, certain ACH proprietary information, CUI, and Export Controlled Information ("ECI")[2] shall not be disseminated to foreign nationals without proper authorization. Moreover, because ACH's contract with the DoD involves technology that creates jet fuel for U.S. military aircraft, the federal government considers all such information and material relating to the contract to be controlled information, meaning it is subject to additional safeguards concerning dissemination because its "export could reasonably be

---

information as specified by law and the government contracting agency in order to protect national security interests and nonproliferation objectives. *See* DoD CUI Program, https://www.dodcui.mil/Export-Control/Export-Controlled/.

The DoD defines Controlled Unclassified Information ("CUI") as unclassified information that requires safeguarding and dissemination controls in accordance with laws, regulations, government-wide policies and/or agency-wide policies. U.S. Dep't of Def. Instr. NO. 5200.48, Controlled Unclassified Information (CUI) §§ 2,5 (March 6, 2020). An "unclassified disclosure" is defined as a "[c]ommunication or physical transfer of classified or controlled unclassified information to an unauthorized recipient." U.S. Dep't of Def. Man. No. 5200.01-V2, Glossary (Feb. 24, 2012).

[2] ECI is a subcategory of CUI. 22 C.F.R §§ 120-130, known as the International Traffic in Arms Regulations ("ITAR") and 15 C.F.R. §§ 730-774, known as the Export Administration Regulations ("EAR"), "establish policies and procedures" for safeguarding controlled information and consider "any release or disclosure of controlled technology or technical data to any foreign person, whether it occurs in the United States or abroad, [to be] deemed an export, requiring either an export license or authorization for disclosure." U.S. Dep't of Def. Instr. NO. 2040.02, International Transfers of Technology, Articles and Services, encl. 4 (Mar. 27, 2014). Moreover, "[c]ontrolled technology or technical data is considered to be released or disclosed when information is transferred to foreign persons by means of: (1) a visual inspection, (2) an oral exchange . . . (4) the use of any other medium of communication, including but not limited to electronic, magnetic, or laser technology." *Id*. The procedures under ITAR and EAR apply to "[f]oreign persons visiting with U.S. DoD contractors." *Id.*

expected to adversely affect the United States national security and nonproliferation objectives." *Export Controlled*, DoD CUI Program, https://www.dodcui.mil/Export-Control/Export-Controlled/.[3]

**RESPONSE:** AirCo's agreements with the DoD are written agreements that speak for themselves. The statutes and regulations contained in the footnote are written documents which speak for themselves.  To the extent an additional response is required, except as expressly admitted, denied.

22.    ACH also has government contracts which specifically prohibit ACH from "contracting to participate, collaborate, [or] coordinate bilaterally in any way with China or a Chinese-owned company using funds appropriated on or after April 25, 2011."

**RESPONSE:** AirCo's government agreements are written agreements that speak for themselves. AirCo admits it is party to contracts with government agencies.  To the extent an additional response is required, except as expressly admitted, denied.

23.    Under Section 3.5 of U.S. Department of Defense Instruction ("DoDI") 5200.48, ACH is required to report any unauthorized dissemination of CUI and/or ECI to the DoD Moreover, Section 1.2 of DoDI 5200.48 requires that "[a]ll DoD CUI must be controlled until authorized for public release in accordance with DoD Instructions."

---

[3] The DoD CUI Program states that export-controlled information includes "items identified in export administration regulations, international traffic in arms regulations and the munitions list." *Export Controlled*, DoD CUI Program, https://www.dodcui.mil/Export-Control/Export-Controlled/. ACH's technology is considered a Category V munition, Explosives and Energetic Materials, Propellants, Incendiary Agents, and Their Constituents under 22 C.F.R. § 121.1. Specifically, ACH's technology falls under Category V(i), which includes "[d]evelopmental . . . fuels . . . or precursors therefor funded by the Department of Defense via contract or other funding authorization" as well as Category V(j), covering "[t]echnical data . . . and defense services directly related to the defense articles described in paragraphs (a) through (i) of this category." 22 C.F.R. § 121.1 (g)(8)(2)(i) and (j).

**RESPONSE:** AirCo's agreement with the DOD is a written agreement that speak for itself. AirCo admits it is party to contracts with government agencies. To the extent an additional response is required, except as expressly admitted, denied.

24.    Dr. Sheehan's responsibilities included overseeing ACH's various government contracts and his direct reports included the Directors of Government & Defense, Operations, IT & Security, and Regulatory Affairs. Indeed, he was identified as the Principal Investigator ("PI") on ACH's key contracts with its customers, including NASA and the NSF. In this role, Dr. Sheehan served as the primary liaison between ACH and its customers, and had a duty to ensure any funds were used appropriately, as well as a duty to notify customers of any potential compliance-related issues.

**RESPONSE:** AirCo's contracts are written agreements that speak for themselves. AirCo admits that the Directors of Government & Defense, Operations, IT & Security, and Regulatory Affairs reported to Dr. Sheehan and that Dr. Sheehan had a duty to ensure any funds were used appropriately, as well as a duty to follow the company's policies regarding compliance-related issues. To the extent an additional response is required, except as expressly admitted, denied.

25.    Until Dr. Sheehan's involuntary placement on administrative leave in October 2024, Dr. Sheehan and other ACH employees,[4] were working diligently with the DoD's DIU to develop more robust information controls at ACH. During this time, Dr. Sheehan and other employees warned ACH's CEO and Board members that the Company's information controls were insufficient and implementation of additional controls should be prioritized ahead of other

---

[4] One of these employees resigned from ACH on October 15, 2024, after refusing the Board's request to deliver a scripted message to the DoD that materially misrepresented Dr. Sheehan's status at ACH following Dr. Sheehan's placement on involuntary leave from the Company.

initiatives within the Company, such as fundraising and marketing. However, Board members, including Mr. Constantine in particular, dismissed their concerns and deprioritized the implementation of the controls urged by Dr. Sheehan and other employees.

**RESPONSE:** AirCo denies the allegations of Paragraph 25 and the accompanying footnote, except admits that Sheehan was placed on administrative leave in October 2024. To the extent an additional response is required, except as expressly admitted, denied.

Dr. Sheehan Reports Misappropriation of Government Funds

26.     Around late April 2024, while reviewing expenses for ACH's federal awards, Dr. Sheehan noticed that some expenses appeared to be allocated to unallowable marketing costs, which is not authorized under any of ACH's government contracts. This suggested funds were being mismanaged or misappropriated. Dr. Sheehan reported his concerns to Mr. Jbara, the Chairman of ACH's Board, on April 30, 2024.

**RESPONSE:** AirCo's government contracts are written agreements which speak for themselves. AirCo lacks information sufficient to admit or deny what Mr. Sheehan was or was not doing in April of 2024. AirCo denies that Sheehan "reported his concerns" to Mr. Jbara, but admits that Sheehan discussed expenses with Mr. Jbara on April 30, 2024.  To the extent an additional response is required, except as expressly admitted, denied.

27.     The next day, Dr. Sheehan submitted an e-mail memo to the Company's Board, escalating his concerns regarding mismanagement/misappropriation of federal funds. Based on information available to Dr. Sheehan through October 5, 2024, he is unaware of any action the Board took to address the mismanagement and misappropriation of federal funds that he flagged in his May 1, 2024 memo. To Dr. Sheehan's knowledge, the Board still has not taken any appropriate action to address these issues.

**RESPONSE:** AirCo admits that on May 1, 2024 Sheehan emailed the Companies' Board. That email is a written document which speaks for itself. AirCo lacks information sufficient to admit or deny Mr. Sheehan's knowledge. To the extent an additional response is required, except as expressly admitted, denied.

<u>Dr. Sheehan Reports Improper Disclosures by Lubo Zhou</u>

28.    In or around April 2023, around the time Dr. Sheehan began vocalizing his concerns about vulnerabilities in ACH's information controls, a customer relayed concerns to Dr. Sheehan about ACH's Vice President of Research, Development, and Engineering, Lubo Zhou ("Dr. Zhou"). The customer informed Dr. Sheehan that it had identified Dr. Zhou as a security risk and was concerned that he was sharing government-controlled information with Chinese nationals and Chinese corporations. Dr. Sheehan notified Mr. Constantine, Mr. Jbara, and Arthur Souritzidis ("Mr. Souritzidis"), another member of ACH's Board, again emphasizing the need for increased information controls. Dr. Sheehan continued to raise this issue for months thereafter, but ACH failed to investigate or take action.

**RESPONSE:** AirCo lacks sufficient information necessary to admit or deny what a customer purported to tell Sheehan. To the extent an additional response is required, except as expressly admitted, denied.

29.    In or around September 2024, several ACH employees informed Dr. Sheehan that Dr. Zhou was sharing proprietary engineering information with foreign companies, Dr. Zhou included in a presentation a cost estimate obtained from Dr. Zhou's contacts at Wison Engineering ("Wison"), a Chinese[5] engineering corporation. For Wison to make such an estimate, it would

---

[5] The national origin of the corporation is relevant due to the applicable governing regulations and contractual provisions.

have needed certain technical information related to ACH's government contracts. Dr. Sheehan was concerned that some of the information shared was CUI and ECI.

**RESPONSE:** AirCo lacks sufficient information necessary to admit or deny what employees purported to tell Sheehan or what Sheehan felt about that information. To the extent an additional response to the paragraph and accompanying footnote is required, except as expressly admitted, denied.

30.     Because the dissemination of any such information would violate multiple federal regulations and ACH's contractual obligations to the DoD and NASA, as well as pose a danger to national security interests, Dr. Sheehan informed Mr. Constantine, Mr. Jbara and other directors about his concerns. Dr. Sheehan also contacted ACH's designated security contact at the DoD's DIU, to keep the contracting office briefed of the situation.

**RESPONSE:** Paragraph 30 offers legal conclusions to which no response is required. To the extent an additional response is required, AirCo denies the allegations of Paragraph 30.

<u>Dr. Sheehan Reports a Security Breach at ACH</u>

31.     On September 23, 2024, a group—invited by Mr. Constantine—that was affiliated with the World Economic Forum, toured ACH's 94 Scott facilities. The group was brought into one of ACH's controlled laboratory areas that contained proprietary information, CUI and ECI. The tour group included foreign nationals.

**RESPONSE:** AirCo denies the allegations of Paragraph 31, except admits a group toured AirCo's facilities on September 23, 2024. To the extent an additional response is required, except as expressly admitted, denied.

32.     In accordance with DoDI 5200.48, the Company was required to seek authorization *prior* to allowing any foreign nationals to enter the controlled laboratory area because it contained proprietary and controlled information.[6]

**RESPONSE:**  DoDI 5200.48 and the parties' agreements are written documents that speaks for themselves. Paragraph 32 offers legal conclusion to which no response is required.  To the extent an additional response is required, except as expressly admitted, denied.

33.     Dr. Sheehan discovered the foreign nationals in unauthorized areas of the 94 Scott lab when he arrived at the facility later that day. He observed members of the group taking photographs and video in the unauthorized area of the lab. Dr. Sheehan immediately instructed the photographers and videographers to stop documenting and directed the tour group toward authorized areas of the facility. He was informed that the tour had been organized by one of ACH's marketing employees. After speaking with the marketing employee, that employee confirmed that Mr. Constantine had made the final approval for the visit.

---

[6] ACH's Contract with the DoD states: "The Parties agree that research findings and technology developments arising under this Agreement may constitute a significant enhancement to the national defense, and to the economic vitality of the United States. Accordingly, access to important technology developments under this Agreement by Foreign Firms or Institutions must be carefully controlled. The controls contemplated in this Article are in addition to, and are not intended to change or supersede, the provisions of the International Traffic in Arms Regulations (22 C.F.R. Part 120, *et seq.*), the National Industrial Security Program Operating Manual (NISPOM) (DoD 5220.22-M), and the Department of Commerce's Export Administration Regulations (15 C.F.R. Part 730, *et seq.*)." It also states: "Each Party agrees to comply with U.S. Export regulations including, but not limited to, the requirements of the Arms Export Control Act, 22 U.S.C. §§ 2751-2794, including the International Traffic in Arms Regulation (ITAR), 22 C.F.R. § 120 et seq.; and the Export Administration Act, 50 U.S.C. § 4601 et seq., formerly located at 50 U.S.C. app. § 2401- 2420. Each party is responsible for obtaining from the Government export licenses or other authorizations/approvals, if required, for information or materials provided from one party to another under this Agreement. Accordingly, the company shall not export, directly, or indirectly, any products and/or technology, Confidential Information . . . ."

**RESPONSE:** AirCo lacks sufficient information necessary to admit or deny the allegations in Paragraph 33. To the extent an additional response is required, except as expressly admitted, denied.

34.     Later on September 23, 2024, Dr. Sheehan called ACH's external counsel to inform him that there had been an unauthorized visit by foreign nationals during which proprietary information, CUI and ECI were potentially exposed and documented.

**RESPONSE:** AirCo lacks sufficient information to admit or deny the allegations of Paragraph 34. To the extent an additional response is required, except as expressly admitted, denied.

35.     Dr. Sheehan also reported the incident to Mr. Jbara. During their conversation, Mr. Jbara did not indicate that he shared Dr. Sheehan's level of urgency, thus leading Dr. Sheehan to believe Mr. Jbara would do nothing to address this security breach, much like Mr. Jbara had shrugged off Dr. Sheehan's report alerting him to Dr. Zhou's improper sharing of proprietary and government-controlled information.

**RESPONSE:** AirCo denies the allegations of Paragraph 35, except admit Dr. Sheehan discussed the incident with Mr. Jbara. AirCo lacks sufficient information to admit or deny Sheehan's beliefs. To the extent an additional response is required, except as expressly admitted, denied.

36.     Dr. Sheehan called ACH's designated security contact at the DoD's DIU later that afternoon and reported the security breach to the DoD's DIU in order to comply with ACH's contractual and regulatory obligations, and to prevent additional harm resulting from the incident.

**RESPONSE:** AirCo lacks sufficient information to admit or deny the allegations of Paragraph 36. AirCo denies Mr. Sheehan's characterization of AirCo's requisite compliance

protocol. AirCo's contractual and regulatory obligations are written documents which speak for themselves. To the extent an additional response is required, except as expressly admitted, denied.

37.    On September 24, 2024, ACH held a leadership meeting where it was discussed that Dr. Sheehan reported the security breach at the 94 Scott lab. Although the company indicated that it would investigate, Dr. Sheehan is not aware of any corrective action ACH took as a result of the incident.

**RESPONSE:** AirCo denies the allegations of Paragraph 37, except admits Sheehan's concerns were discussed at a September 24, 2024 meeting. To the extent an additional response is required, except as expressly admitted, denied.

38.    On September 26, 2024, three days after Dr. Sheehan reported this latest security breach relating to the unauthorized visit, the Company's Board informed Dr. Sheehan that it was moving forward with a "Leadership Review" which had been recently suggested by a director.

**RESPONSE:** AirCo denies the allegations of Paragraph 38, except admits that the Company informed Sheehan it was conducting a Leadership Review.  To the extent an additional response is required, except as expressly admitted, denied.

39.    On information and belief, the Leadership Review was conducted in a manner as to produce negative results regarding Dr. Sheehan as pretext for placing him on leave in retaliation for his reporting of several security breaches. The results of the Leadership Review were never shared with Dr. Sheehan in writing, instead, he was told orally that he needed to improve his management style.

**RESPONSE:** AirCo denies the allegations of Paragraph 39, except admits that Sheehan was not given any written report related to the investigation. To the extent an additional response is required, except as expressly admitted, denied.

40.     On September 30, 2024, Dr. Sheehan formally informed the DoD's DIU of the security breach in writing.

**RESPONSE:** AirCo lacks sufficient information to admit or deny the allegations of Paragraph 40. To the extent an additional response is required, except as expressly admitted, denied.

41.     That same day, the CEO of a key investor requested and met with Dr. Sheehan to discuss the recent events at ACH, including but not limited to the recent security breach. The investor's CEO did not express concern regarding the incident, and instead implied that Dr. Sheehan should have reported the incident to Mr. Constantine rather than to ACH's designated security contact at the DoD's DIU and/or outside counsel, and by failing to do so, Dr. Sheehan had allegedly engaged in insubordination.

**RESPONSE:** AirCo lacks sufficient information to admit or deny the allegations of Paragraph 41. To the extent a further response is required, except as expressly admitted, denied.

<u>The Government escalates Dr. Sheehan's report of security violations</u>

42.     On October 1, 2024, DoD's DIU escalated Dr. Sheehan's report of the 94 Scott incident to the U.S. Air Force Office of Special Investigation ("OSI").

**RESPONSE:** AirCo lacks information sufficient to admit or deny the allegations of Paragraph 42.

43.     On October 3, 2024, an OSI Special Agent contacted Dr. Sheehan to discuss his report. OSI informed Dr. Sheehan that OSI intended to refer the matter to the Export Enforcement Division of Homeland Security to further address the security breach.

**RESPONSE:** AirCo lacks information to admit or deny the allegations of Paragraph 43.

<u>Dr. Sheehan Refuses to Make False Statements and</u>
<u>ACH Places Dr. Sheehan on Administrative Leave</u>

44.     On October 4, 2024, upon learning that the DoD's DIU had escalated Dr. Sheehan's report to OSI, Mr. Jbara emailed Dr. Sheehan and instructed him to stay away from ACH's premises. The next morning, October 5, 2024, Mr. Jbara suspended Dr. Sheehan's access to his company email without prior notice. Dr. Sheehan took no steps to prevent Mr. Jbara from accessing his emails, nor did he instruct anyone at ACH to try to prevent such access.

**RESPONSE:** AirCo denies the allegations in Paragraph 44, except admits that, on October 4, 2024, Mr. Jbara emailed Dr. Sheehan, which is a written document which speaks for itself, and that on October 5, 2024, Dr. Sheehan's access to his company email was suspended.

45.     On October 6, 2024, the Board held an "emergency" meeting. Dr. Sheehan, as a Board member and per ACH's bylaws, was entitled to notice of this meeting, but such notice was not properly delivered to him. At the Special Meeting, the Board voted to place Dr. Sheehan on involuntary administrative leave of absence until January 1, 2025 and continued suspending Dr. Sheehan's access to his ACH email.

**RESPONSE:** AirCo denies the allegations of Paragraph 45, except admits that, on October 6, 2024, the Board held a meeting, whereby the Board voted to place Dr. Sheehan on an administrative leave of absence until January 1, 2025 and continued suspending access to his ACH email.

46.     Later that day, Mr. Jbara sent Dr. Sheehan a letter instructing him to refrain from communicating with any of the Company's employees, customers, investors or potential investors during his leave. The letter was sent in the evening of October 6, 2024, but back-dated to October 5, 2024.

**RESPONSE:** AirCo admits that Mr. Jbara sent Sheehan a letter which is a written document that speaks for itself. To the extent a further response is required, except as expressly admitted, denied.

47.    On October 16, 2024, ACH, through counsel, asked Dr. Sheehan to reach out to "key DoD contacts, business partners, and employees," via phone or text, but not via his work email, which he still could not access. ACH sent a draft "script" of talking points outlining what Dr. Sheehan should say. The script contained false information, instructing Dr. Sheehan to state he thought investors and customers were in "extremely capable hands" with ACH's new Chief Operating Officer ("COO"), a person Dr. Sheehan has never worked with because that individual was hired while Dr. Sheehan was on leave. The script also falsely conveyed that Dr. Sheehan *voluntarily* took a leave to "recharge."

**RESPONSE:** AirCo denies the allegations of Paragraph 47, except admits that, through counsel, AirCo communicated with Sheehan on October 16, 2024.

48.    On October 18, 2024, Mr. Jbara texted Dr. Sheehan asking if ACH's lawyer had sent over the scripted "talking points for DoD." Dr. Sheehan replied that he would not deliver those talking points because that would be "lying to the federal government." Mr. Jbara replied, "Ok good feedback for me to know!"

**RESPONSE:** AirCo lacks sufficient information to admit or deny the allegations of Paragraph 48, and refers to the messages referenced therein which are written documents which speak for themselves.

49.    Dr. Sheehan's reporting of (i) the apparent misappropriation of government funds, (ii) Dr. Zhou's disclosures of proprietary and controlled information to a Chinese engineering firm, (iii) the security breach, and (iv) his refusal to convey a misleading message to ACH's government

counterparties, are all protected activities under New York's whistleblower statute (N.Y. Lab. Law § 740). Under sections 2(a) and 2(c), ACH'S retaliation against Dr. Sheehan is illegal.

**RESPONSE:** Paragraph 49 states legal conclusions to which no response is required. To the extent a further response is required, except as expressly admitted, denied.

<u>ACH Terminates Dr. Sheehan</u>

50.     On December 30, 2024, ACH held a Special Meeting during which ACH terminated Dr. Sheehan's employment, allegedly for cause. Notice and the meeting were timed so that Dr. Sheehan would be unable to change his international travel schedule and thus would not be able to attend the meeting.

**RESPONSE:** AirCo denies the allegations in Paragraph 50, except admits that, on December 30, 2024, it held a meeting during which it terminated Sheehan for Cause.

51.     ACH did not notify Dr. Sheehan regarding the basis for ACH's determination that his termination was "for cause," nor did ACH interview him in connection with any purported investigation.

**RESPONSE:** AirCo denies the allegations of Paragraph 51.

52.     Because ACH mischaracterized Dr. Sheehan's involuntary termination "for cause" in retaliation for his whistleblowing activity, he lost his right to exercise options granted to him under the Option Agreements. These options are worth tens of millions of dollars and once exercised, represent significant equity in ACH.

**RESPONSE:** AirCo denies the allegations of Paragraph 52, except admits Sheehan was terminated for Cause, losing his right to exercise options granted to him. The Option Agreements are written agreements which speak for themselves.

53.     By placing Dr. Sheehan on an involuntary leave, excluding him from Board meetings, and terminating him for cause (depriving him of his valuable vested stock options with

a fair market value of tens of millions of dollars, among other damages), ACH engaged in retaliatory conduct against Dr. Sheehan for his engaging in protected whistleblower activity.

**RESPONSE:** AirCo denies the allegations of Paragraph 53.

**<u>COUNT I</u>**
**Unlawful Termination/Retaliation**
<u>(New York Labor Law Section 740)</u>

Plaintiff incorporates by reference each and every allegation previously made herein as if the same were fully set forth.

**RESPONSE:** AirCo incorporates all responses to previous allegations herein incorporated by reference.

54.    Dr. Sheehan had a reasonable belief that the misappropriation of federal funds was improper, breached Company contracts with government agencies, violated federal law, and posed a danger to public safety by endangering national security interests.

**RESPONSE:** AirCo denies the allegations of Paragraph 54.

55.    Dr. Sheehan informed Mr. Jbara and subsequently the Board of Directors of the misappropriation. The Board of Directors had the authority to take corrective action regarding the misappropriation.

**RESPONSE:**  AirCo lacks information sufficient to admit or deny the allegations of Paragraph 55.

56.    Based on Mr. Jbara and the Board's inaction, Dr. Sheehan reasonably believed that ACH would not report the misappropriation to the DoD's DIU and the government would not have the opportunity to mitigate or remediate the misappropriation if he did not report it himself.

**RESPONSE:** AirCo denies the allegations of Paragraph 56.

57.    Dr. Sheehan's reporting of the misappropriation to the Board and to DoD's DIU is protected activity.

**RESPONSE:** Paragraph 57 states legal conclusions to which no response is required. To the extent a further response is required, denied.

58.     Additionally, Dr. Sheehan had a reasonable belief that the access granted by Mr. Constantine to foreign nationals, including allowing them to take photographs and videos while within ACH's facilities which contained controlled information, including areas specifically marked as off-limits and containing CUI and ECI was improper, breached Company contracts with government agencies, violated federal law, and posed a danger to public safety by endangering national security interests.

**RESPONSE:** AirCo denies the allegations of Paragraph 58.

59.     Dr. Sheehan informed Mr. Jbara of the security breach. As Chairman of the Board, Mr. Jbara had authority to take corrective action regarding the security breach.

**RESPONSE:** AirCo lacks information sufficient to admit or deny the allegations of Paragraph 59. AirCo's Bylaws are a written document that speaks for itself regarding authority for corrective action. To the extent a further response is required, except as expressly admitted, denied.

60.     Based on Mr. Jabra's remarks and past behavior when informed of a security breach, and the Board's inaction in response to such incidents, as well as Mr. Jbara and the Board's inaction in this instance, Dr. Sheehan reasonably believed that ACH would not report the security breach to the DoD's DIU and the government would not have the opportunity to mitigate or remediate the security breach if he did not report it himself.

**RESPONSE:** AirCo denies the allegations of Paragraph 60.

61.     Dr. Sheehan's reporting of the security breach to the Board and to the DoD's DIU is protected activity.

**RESPONSE:** Paragraph 61 contains legal conclusions to which no response is required. To the extent a further response is required, denied.

62.     Further, Dr. Sheehan had a reasonable belief that Dr. Zhou's dissemination of protected information containing CUI and ECI to Chinese foreign nationals was improper, breached Company contracts with government agencies, violated federal law, and posed a danger to public safety by endangering national security interests.

**RESPONSE:** AirCo denies the allegations of Paragraph 62.

63.     Dr. Sheehan informed Mr. Jbara, Mr. Constantine, and other directors about Dr. Zhou's improper disclosures.

**RESPONSE:** AirCo denies the allegations in Paragraph 63.

64.     As Chairman of the Board and CEO of ACH, Mr. Jbara and Mr. Constantine had authority to take corrective action.

**RESPONSE:** AirCo's Bylaws regarding authority to take corrective action is a written document that speaks for itself.

65.     Based on ACH's past inaction in response to information control deficiencies and Mr. Jbara and Mr. Constantine's lack of concern in response to being alerted of these violations, Dr. Sheehan reasonably believed that ACH would not report the improper disclosures to the DoD's DIU and the government would not have the opportunity to mitigate or remediate the security breach if he did not report it himself.

**RESPONSE:** AirCo denies the allegations of Paragraph 65.

66.     Dr. Sheehan's reporting of Dr. Zhou's disclosures to the Board and to the DoD's DIU is protected activity.

**RESPONSE:** Paragraph 66 states legal conclusions to which no response is required. To the extent a further response is required, denied.

67.    Additionally, Dr. Sheehan had a reasonable belief that conveying a misleading message to ACH's government counterparties was improper, breached Company contracts with government agencies, violated federal law, and posed a danger to public safety by endangering national security interests.

**RESPONSE:** AirCo denies the allegations of Paragraph 67.

68.    Dr. Sheehan's refusal to participate in such conduct is protected activity.

**RESPONSE:** Paragraph 68 states legal conclusions to which no response is required. To the extent a further response is required, denied.

69.    In direct response to Dr. Sheehan's protected activity, ACH took retaliatory actions. ACH placed him on administrative leave, and upon receiving notification of potential litigation from Dr. Sheehan's counsel, placed Dr. Sheehan on a three-month involuntary leave of absence. On December 30, 2024, ACH terminated Dr. Sheehan, purportedly for cause.

**RESPONSE:** AirCo denies the allegations of Paragraph 69.

70.    Dr. Sheehan was an employee at-will and the Board could have terminated his employment for any lawful reason or no reason. By improperly characterizing his termination as for cause, he lost the right to exercise stock options with a fair market value of tens of millions of dollars, and was subjected to other damages by being forced out of the company he co-founded.

**RESPONSE:** AirCo admits Sheehan was an employee at-will and the Board could have terminated his employment for any lawful reason or no reason. AirCo denies its termination of Sheehan for Cause was an improper characterization. To the extent a further response is required, except as expressly admitted, denied.

71.    ACH's retaliation against Dr. Sheehan is prohibited under New York law. As a direct and proximate result of Defendant's retaliatory conduct, Dr. Sheehan has suffered and will continue to suffer significant injury, including to his business and professional reputation, and his current and future employment opportunities, as well as substantial financial harm. Dr. Sheehan is entitled to an order of reinstatement and damages in the amount of all lost wages, stock options, benefits and other remuneration.

**RESPONSE:** Paragraph 71 states legal conclusions to which no response is required. To the extent a further response is required, denied.

72.    The Court should also award attorney's fees pursuant to N.Y.L.L. § 740(5)(e) and punitive damages pursuant to N.Y.L.L. § 740(5)(g), on the basis that the actions taken by ACH were willful, malicious and/or wanton.

**RESPONSE:** AirCo denies the allegations in Paragraph 72.

<u>**COUNT II**</u>
**Breach of Contract**
<u>(Non-Statutory Stock Option Agreements)</u>

73.    Plaintiff incorporates by reference each and every allegation previously made herein as if the same were fully set forth.

**RESPONSE:** AirCo incorporates all responses to previous allegations herein incorporated by reference.

74.    On December 31, 2019, as a Participant in the Non-Statutory Stock Option Agreement, Dr. Sheehan executed the 2019 Non-Statutory Stock Option Agreement.

**RESPONSE:** AirCo admits on December 31, 2029, Sheehan executed the 2019 Non-Statutory Stock Option Agreement. The 2019 Non-Statutory Stock Option Agreement is a written document which speaks for itself. To the extent a further response is required, except as expressly admitted, denied.

75.     Moreover, on August 5, 2021, as a Participant in the Non-Statutory Stock Option Agreement, Dr. Sheehan executed the 2021 Non-Statutory Stock Option Agreement. The 2019 and 2021 Non-Statutory Stock Option Agreements are collectively referred to herein as the "Option Agreements."

**RESPONSE:** AirCo admits that on August 5, 2021, Sheehan executed the 2021 Non-Statutory Stock Option Agreement. The 2021 and 2019 Non-Statutory Stock Option Agreement are written agreements which speak for themselves. To the extent a further response is required, except as expressly admitted, denied.

76.     The Option Agreements are valid and enforceable contracts and are governed by the laws of the State of Delaware. *See* Ex. 1 at § 9; Ex. 2 at § 9.

**RESPONSE:** The Option Agreements are written agreements which speak for themselves. To the extent a further response is required, except as expressly admitted, denied.

77.     The 2019 Non-Statutory Stock Option Agreement granted Dr. Sheehan options to purchase up to 2,911,000 shares of ACH stock for $1.06 per share, a considerable discount from its current fair market value. Moreover, the 2021 Non-Statutory Stock Option Agreement granted Dr. Sheehan options to purchase up to 50,505 shares of ACH stock for an exercise price of $0.99 per share, a considerable discount from its current market value.

**RESPONSE:** The 2021 and 2019 Non-Statutory Stock Option Agreement are written agreements which speak for themselves. To the extent a further response is required, except as expressly admitted, denied.

78.     According to the terms of each of the Option Agreements, if Dr. Sheehan is terminated for cause, he "shall have no right to exercise this Option upon such termination." *See* Ex. 1 at § 3(e); Ex. 2 at § 3(e).

26

**RESPONSE:** The Option Agreements are written documents which speak for themselves.

79.     In terminating Dr. Sheehan's employment for cause for an improper purpose in retaliation for his whistleblowing activity, ACH also cancelled his options granted as a Participant in the Option Agreements, in breach of those Agreements.

**RESPONSE:** Paragraph 79 states legal conclusions to which no response is required. To the extent a further response is required, denied.

80.     In the alternative, by terminating Dr. Sheehan's employment for "cause" where no cause existed, ACH breached the Option Agreements.

**RESPONSE:** Paragraph 80 states legal conclusions to which no response is required. To the extent a further response is required, denied.

81.     As a direct and proximate result of Defendant's breach, Dr. Sheehan has lost the ability to exercise his options to purchase shares of ACH stock currently valued at tens of millions of dollars. As a Participant in the Non-Statutory Stock Option Plan, Dr. Sheehan is entitled to recover from ACH the damages flowing directly from ACH's breach.

**RESPONSE:** Paragraph 81 states legal conclusions to which no response is required. To the extent a further response is required, denied.

<u>**COUNT III**</u>
**Breach of the Covenant of Good Faith and Fair Dealing**
<u>(Non-Statutory Stock Option Agreements)</u>

82.     Plaintiff incorporates by reference each and every allegation previously made herein as if the same were fully set forth.

**RESPONSE:** AirCo incorporates all responses to previous allegations herein incorporated by reference.

83.     On December 31, 2019, Dr. Sheehan was granted options to purchase up to 2,911,000 shares of ACH stock for the Grant price of $1.06 per share.

**RESPONSE:** AirCo admits the allegations of Paragraph 83.

84.    On August 5, 2021, Dr. Sheehan was granted options to purchase up to 50,505 shares of ACH Stock for the Grant price of $0.99 per share.

**RESPONSE:** AirCo admits the allegations of Paragraph 84.

85.    Under Delaware law, the covenant of good faith and fair dealing is implied in all contracts and precludes one party to a contract from intentionally acting to deprive another party to the contract the fruits of the bargain struck.

**RESPONSE:** Paragraph 85 states legal conclusions to which no response is required.

86.    By terminating Dr. Sheehan for cause in retaliation for his protected whistleblowing activity, ACH acted intentionally to inequitably deny Dr. Sheehan of the benefit of the bargain struck in the Option Agreements.

**RESPONSE:** Paragraph 86 states legal conclusions to which no response is required. To the extent a further response is required, denied.

87.    In the alternative, by terminating Dr. Sheehan for "cause" where no cause existed, ACH acted intentionally to inequitably deny Dr. Sheehan the benefit of the bargain struck in the Option Agreements.

**RESPONSE:** Paragraph 87 states legal conclusions to which no response is required. To the extent a further response is required, denied.

88.    As a direct and proximate result of Defendant's action, Dr. Sheehan has lost the option to purchase in excess of 2,911,000 shares of ACH stock, which have a fair market value of tens of millions of dollars, among other damages. Dr. Sheehan is entitled to recover from ACH the damages flowing directly from ACH's deliberate breach of the covenant of good faith and fair dealing.

**RESPONSE:** Paragraph 88 states legal conclusions to which no response is required. To the extent a further response is required, denied.

## FIRST AFFIRMATIVE DEFENSE

The Complaint fails to state a claim upon which relief may be granted against Defendant.

## SECOND AFFIRMATIVE DEFENSE

At all times material hereto, the actions of Defendant was always justified under the circumstances and Defendant acted in a manner that was proper, reasonable and lawful and in the exercise of good faith.

## THIRD AFFIRMATIVE DEFENSE

Plaintiff's alleged injuries, sufferings and damages, if any, were caused by Plaintiff's own acts, omissions, or conduct.

## FOURTH AFFIRMATIVE DEFENSE

Plaintiff's claims may be barred, in whole or in part, by the doctrine of unclean hands.

## FIFTH AFFIRMATIVE DEFENSE

Defendant's decision to terminate Plaintiff for Cause has no relation to Plaintiff's decision to report purported security breaches to the Government or any relation to any "protected" activity.

## SIXTH AFFIRMATIVE DEFENSE

Defendant's decision to report the purported breaches to the Government are not protected acts and do not qualify as "protected activity."

## SEVENTH AFFIRMATIVE DEFENSE

AirCo and its employees did not engage in any activity prohibited by any of their agreements with the Government.

## EIGHTH AFFIRMATIVE DEFENSE

Plaintiff engaged in conduct for the sole purpose of undermining and causing harm to AirCo, its Board, and its employees.

## NINTH AFFIRMATIVE DEFENSE

Defendant reserves the right to assert such other additional and/or affirmative defenses that may become known to them through discovery.

## PRAYER FOR RELIEF

Wherefore, Air Company Holdings, Inc., as Defendant, respectfully requests the following relief:

a.    Dismissing all claims against Air Company Holdings, Inc. with prejudice;

b.    Awarding Air Company Holdings, Inc.'s costs, including attorneys' fees; and

c.    Providing such other and further relief as the Court deems just and equitable under the circumstances.

## COUNTERCLAIM

Counterclaimants Defendant Air Company Holdings, Inc. ("Counter-Plaintiff or "the Company" or "AirCo") , allege as follows:

## NATURE OF THE ACTION

1.    This is a counterclaim for a declaratory judgement and monetary relief as a result of Stafford Sheehan's ("Sheehan" or "Counter-Defendant") serious fiduciary and contractual breaches which have caused serious harm to AirCo.

2.    The Company was founded in early 2017 by Sheehan and Gregory Constantine ("Mr. Constantine") and was incorporated on August 14, 2017. Mr. Constantine is the Company's current Chief Executive Officer.

3.     Among the documents executed between Sheehan and the Company over the course of his employment were the Proprietary Information Agreement ("PIA" a copy of which is attached hereto as Exhibit A), which made explicit that Sheehan was an at-will employee of the Company (See Exhibit A at ¶13), and two Nonstatutory Stock Option Agreements ("Stock Option Agreement 1", effective December 31, 2019, and "Stock Option Agreement 2", effective August 5, 2021, copies of which are attached hereto as Exhibit B and Exhibit C, respectively), which granted Sheehan the right to purchase shares of Common Stock in the Company under certain circumstances, but which became un-exercisable and forfeit upon the Company's termination of the Sheehan for Cause. See Exhibit B at 3(e).

4.     Generally, the Company's mission is to create products and fuels from carbon dioxide to help address climate change and energy independence.

5.     In 2019, the Company's first product, Air Vodka, was released. Thereafter, the Company launched its own hand sanitizer, perfume, industrial chemicals, and fuels.

6.     In 2020, Time Magazine named the Company's Vodka product one of the 100 Best Innovations of the year. The Company currently has partnerships with NASA and the United States Department of Defense. The Company is also currently in the process of developing a sustainable aviation fuel (SAF).

7.     While the Company has enjoyed tremendous commercial success and recently completed a highly successful Series B financing round, internal dissension surrounding Counter-Defendant began to mount towards the end of 2023 and into 2024.

8.     On December 30, 2024, after the culmination of an extensive internal investigation relating to that dissension, as detailed, *infra*, Sheehan was terminated for Cause by the Company's Board of Directors.

9.      This Action seeks, among other forms of relief, recompense for the damages Sheehan's actions have caused the Company to incur, and a declaration that certain previously-outstanding options for Sheehan to purchase certain shares of capital stock of the Company have been completely terminated by virtue of the Board's termination of his employment for Cause.

## THE PARTIES

10.     The Company is a corporation organized and existing under the laws of the State of Delaware.

11.     Sheehan is an adult individual who, on information and belief, is residing at 201 Stoney Hollow Road, Tiverton, RI 02878. Sheehan is the former Director, President, Secretary, and Chief Technology Officer of the Company.

## JURISDICTION

12.      This Court has subject matter jurisdiction over this matter pursuant to 28 USCA § 1332 and 28 USCA § 2201

13.      This Court has personal jurisdiction over Sheehan by virtue of their decision to bring case 1:25-cv-00932-ARR-PK in this Court which AirCo now answers and raises counterclaims in response to.

## FACTUAL BACKGROUND

14.      Prior to Sheehan's termination for Cause on December 30, 2024, in August of 2024, a Company Board member, in what the Company would later learn was generated by a behind-the-scenes coordination with Sheehan , raised the suggestion that Mr. Constantine should be removed as CEO.

15.     This suggestion prompted the Company to commence an investigation and internal review to assess the leadership dynamics within the Company.

16.     The investigation, involved the interviews of over a dozen employees from a wide spectrum of the Company's multi-faceted operations, ironically resulted in the revelation of *Sheehan's* mismanagement as well as his repeated breaches of both his fiduciary duties to the Company and contractual obligations.

17.     As a result of the Company's initial findings, on October 5, 2024, the Company held an emergency Board meeting where they voted to place Sheehan on paid administrative leave through January 1, 2025, while they continued to investigate and explore the full extent of his actions.

18.     Thereafter, throughout October of 2024, a battle ensued between Sheehan and the Company wherein Sheehan attempted to obstruct the Company from accessing his email to impede its investigation into his conduct.

19.     Notwithstanding Sheehan's obstructions, which included Sheehan's directing a Company employee to falsely represent to another employee that he may lose his job if he provided Sheehan's emails to the Company, the Company gained access to Sheehan's emails and a trove of additional incidents of misconduct came to light.

### A.     Sheehan's Mismanagement

20.     Among the Company's alarming findings, it learned that employees felt Sheehan lacked the social awareness and managerial aptitude to effectively lead the Company. His communication style was described as aggressive and counterproductive, often resulting in internal friction, lowered morale, and in at least two circumstances, the total resignations of critical employees. Employees reported that Sheehan created a divisive environment by undermining others—particularly Company CEO Mr. Constantine—by fostering an atmosphere of fear and

conflict. Employees reported that Sheehan's reluctance to engage in essential collaboration, coupled with a pattern of avoiding accountability, exacerbated these tensions.

21.     Among many other negative characteristics, Company employees reported Sheehan as being reactive, accusatory, avoiding proper communication channels, and conveying lack of respect in his interactions which led to misalignment and confusion.

22.     Sheehan was characterized as frequently overstepping areas outside of his expertise or organizational domain, micromanaging processes and individuals, demoralizing and hindering Company progress.

23.     Employees described Sheehan's leadership style as lecturing, condescending, and treating others as if they were "misbehaving children", creating a toxic environment and reduced morale.

24.     Employees also reported concerns over Sheehan's ability to manage teams and build consensus. His leadership was characterized by siloed decision-making and a tendency to micromanage areas outside of his expertise, often to the detriment of the Company's progress. Employees made clear that Sheehan's leadership and management style posed a great risk to the organization's cohesion and long-term success.

25.     When asked for specifics, Company personnel were able to point to detailed examples of Sheehan's erratic, disorganized, toxic, and hostile behavior throughout 2024, recounting the following, non-exhaustive incidents across the year:

        a.      In January 2024, delegating role critical CTO responsibilities to less capable and less prepared subordinates.

b.      In January 2024, confirming enormous Government proposals without any responsible, independent assessment of his own as to how those proposals would impact Company operations or fiscal longevity.

c.      In February 2024, delaying budget finalization without providing any clear action or timeline resulting in a 5 month long, wasteful process.

d.      In April 2024, generating a dispute between himself and a critical Company employee over the technical roles in the Government team.

e.      In May 2024, creating a misalignment of financial reporting using a disjointed financial request and communications process which led to him making inappropriate comments to a critical employee regarding an internal senior leader's superior credentials...

f.      In July 2024, exhibiting unprofessional behavior with a COO candidate who, after a positive experience with other Company employees through multiple interview rounds, reported Sheehan to his hiring agency, which then relayed the experience  to the Company's CEO and VP of People, along with the agency's own negative experience working with Sheehan.

g.      In September 2024, offering a promotion and revised compensation to a Government & Defense team member without obtaining prior approval and alignment from the VP of Finance and HR Business Partner while failing to adhere to established Company processes.

h.      Throughout 2024, demonstrating a consistent pattern of being unavailable due to being double and triple booked at the last minute for a recurring scheduled call with the Company's People team. Company employees were

able to point to at least 16 examples of last-minute cancellations or reschedules which significantly frustration Company operations.

**B.    Sheehan's Fiduciary Duty and Contractual Breaches**

26.    In addition to Sheehan's extensive mismanagement, the revelation of Sheehan's fiduciary duty and contractual breaches was also widespread. For example, in September of 2024, Sheehan falsely represented to a significant investor that Mr. Constantine would no longer be the Company's CEO, despite no Board decision to this effect. Sheehan also knowingly misrepresented to the investor the Company's "plans" for an office in Connecticut.

27.    Specifically, as an explicitly listed condition precedent to their investment, this investor required that the Company have firm plans to maintain physical office space in Connecticut. Given this condition, the Company's investment advisor recommended the Company not move forward with this investor due to the lack of an ability to move the Company to Connecticut. Notwithstanding this recommendation, during his negotiations with this investor, in which Sheehan had been entrusted to take lead, Sheehan deliberately misrepresented to them through a side letter that the Company did have plans to maintain Connecticut office space, and then took efforts to conceal or minimize this representation from the Company when the investment was raised in discussions with the Board. When the investor learned of these misrepresentations, the Company had to return $2.5 million of their previously invested funds, as well as a settlement payment, reducing the Company's available capital and enterprise value.

28.    In September and October of 2024, Sheehan released non-public, confidential, proprietary information to unauthorized internal personnel, as well as third parties, including investors relating to both the Company's business plans as well as the Company's ongoing

investigation into his conduct, causing the Company to clean up and contain the information leaks as well as correct the erroneous information Sheehan conveyed therewith.

29.    Specifically, with regards to internal personnel, Sheehan falsely represented to at least two employees that Mr. Constantine would be removed as CEO despite no decision to this effect. With regards to third parties, Sheehan falsely represented to at least four separate investors that Mr. Constantine would be removed as CEO, creating reputational and operational risks that the Company had to expend significant resources in retracting and containing. Sheehan's misrepresentations also jeopardized the Company's ability to generate further investment from these investors, one of whom explaining they were now concerned about "investing into a fight." Today, these relationships remain strained due to Sheehan's actions.

30.    In September of 2024, Sheehan agreed to giving a potential investor an observer seat on the Company's Board without Company approval, despite having been directed to provide full disclosure of any and all side letters to the Company for leadership to review and deliberate.

31.    Colloquially, side letters are peripheral terms proposed by an investor, in addition to their original investment terms, which augment the same and frequently provide that investor with certain levels of added access into the Company and its operations. In light of a side letter's power to grant an investor with significant rights, the Company made clear to Sheehan on numerous occasions that any and all letters should be proposed and reviewed by leadership before being entered into.

32.    Notwithstanding these directives, when asked by a Company employee whether he had obtained Company approval for this particular side letter, which provided this investor with extremely significant access, Sheehan falsely misrepresented that he had. However, it was only after Sheehan was placed on leave that the Company learned about the board observer

commitments in this side letter. Thereafter, the Company had to expend considerable resources to back track on this concession and renegotiate with that investor for granting information rights instead of a formal observer seat. This caused the Company considerable time, energy, and resources and wound up putting tremendous strain on that investor relationship.

33.    In September of 2024, Sheehan independently, and without Board authority, retained an attorney on behalf of the Company and represented to that attorney that he had Board support to remove Mr. Constantine and negotiate a severance package. After that attorney learned of these misrepresentations, he terminated his engagement with the Company due to the same. Incidentally, this attorney was already corporate counsel to a Company investor, so Sheehan's actions also created a material conflict of interest he was unprepared to resolve, causing internal tension along with the expenditure and allocation of resources for the Company's need to contain his conduct.

34.    In October and November of 2024, Sheehan directed a Company employee to advise a Company IT employee that that the production of Sheehan's emails was improper.

35.    This created both significant legal exposure and necessitated the placing of the IT employee on investigatory leave due to that employee's refusal to produce Sheehan's emails on the basis of the knowingly false warnings given to him by an employee at Sheehan's behest.

**C.    The Board Terminates Sheehan's Employment For Cause and Removes Him From the Board**

36.    Throughout its review and investigation, the Board corresponded with one another regarding its findings and its obligations to the Company in light of those findings.

37.    On December 30, 2024, acting in the best interests of the Company, the Board voted to terminate Sheehan's employment for Cause and remove him as an officer.

38

38.    On January 9, 2025, the Common Stockholders voted to remove Sheehan from the Board.

**D.    New Investor Withdraws Investment Based on Sheehan's Meritless Accusations**

39.    Even after his termination, however, Sheehan continued to cause enormous and irreparable damages to the Company.

40.    For example, for years the Company was heavily involved in serious conversations with an investor with regards to their making a significant investment in AirCo.

41.    Around September of 2024, those conversations took a serious, positive upturn when AirCo began negotiating with the investor to join AirCo's Series B.

42.    While Sheehan was not personally involved in the diligence process from September 24, 2024 onwards, he still received board meeting materials during his paid leave which included updates about the investor and their upcoming investment.

43.    From having been with the Company since its inception, and being both intimately involved and privy to its most confidential investor conversations, Sheehan was in a uniquely informed position to be well aware of how sensitive investor relations become during periods of diligence and onboarding, and how increasingly fragile those relationships are when the investment amounts exceed millions of dollars.

44.    From the board meeting materials Sheehan received, he was made aware that the investor was slated to invest $5,000,000 USD into the Company's Series B, along with heads of terms of a priced offtake agreement with agreement to finalize a negotiation of a price offtake agreement.

45.    From his experience with the Company, and reception of these materials, Sheehan was also aware the offtake agreement with the investor would have potentially generated hundreds

of millions of dollars in revenue over its lifetime. Similar offtake agreements have been entered into between the investor and other sustainable aviation fuel companies to which those companies raised rounds of funding with enterprise value increases of more than double their current valuation based on those agreements.

46.     Notwithstanding his complete and total awareness of the precarious ground on which this enormous, multi-faceted investment stood, and the nearly incalculable value it would have provided AirCo, Sheehan decided to file a completely baseless lawsuit against AirCo in this Court full of incendiary and inflammatory allegations for which he lacked a shred of proof.

47.     Indeed, Sheehan's allegations were especially egregious in light of his having reached out to AirCo through counsel, offering both to voluntarily resign from the Company in response to their alerting him he was about to be terminated for Cause, and collaborate with AirCo on the drafting of a joint, external, public facing statement which would ensure AirCo's smooth continuity with investors after his departure.

48.     For Sheehan to then suddenly about-face and publicly mudsling AirCo, with what time will unquestionably demonstrate are totally meritless accusations, makes his conduct all the more aggravating and flagrantly unjustified.

49.     Sheehan's knew full well what his allegations would do to the Company and he made them anyway; without basis, without proof.

## COUNT I
## Breach of Fiduciary Duty (Duty of Loyalty)

50.     Counter-Plaintiff repeats and realleges the allegations in the foregoing paragraphs as if fully set forth herein.

51.     As a President, Secretary, Director, and Chief Technology Officer of the Company, Sheehan owed a fiduciary duty to the Company.

52.     Sheehan breached this fiduciary duty by, among other things:

a.     Falsely representing the Company's strategic and operational plans to a significant Company investor in order to improperly procure an investment from them on false pretenses ¶¶ 26-27, supra;

b.     Making deliberate misrepresentations to at least four investors that Mr. Constantine would be stepping down as CEO, despite knowing the Board had made no decision to this effect. ¶29, supra.;

c.     Disclosing non-public, confidential information to third parties, including at least four investors, about the Company, the Company's Board of Directors, and the Company's business plans. ¶¶ 28-29 supra.;

d.     Entering into a side letter agreement with a potential investor to give them significant observer seat access on the Company's Board without Company discussion, review, or approval, and thereafter misrepresenting he had previously obtained that approval. ¶¶ 30-32, supra.

e.     Directing an employee to pressure an IT employee away from releasing Sheehan's emails, which necessitated the placing of that IT employee on investigatory leave due to that refusal. ¶¶ 34-35, supra.

53.     Through these actions, Sheehan exceeded the scope of his authority and failed to act in the best interests of the Company and its Stockholders.

54.     Sheehan's actions have directly damaged the Company's operations, investor relations, and leadership integrity.

55.     Sheehan's actions have resulted in significant financial and reputational damage to the Company.

41

## COUNT II
### Breach of Fiduciary Duty (Duty of Care)

56.     Counter-Plaintiff repeats and realleges the allegations in the foregoing paragraphs as if fully set forth herein.

57.     As a director and officer of the Company, Sheehan, in his role as Chief Technology Officer, owed a fiduciary duty to the Company.

58.     Sheehan breached this fiduciary duty by, among other things:

a.     Falsely representing the Company's strategic and operational plans to a significant Company investor in order to improperly procure an investment from them on false pretenses. ¶¶ 26-27 supra.;

b.     Making deliberate misrepresentations to at least four investors that Mr. Constantine would be stepping down as CEO, despite knowing the Board had made no decision to this effect. ¶ 29, supra.;

c.     Disclosing non-public, confidential information to third parties, including at least four investors, about the Company, the Company's Board of Directors, and the Company's business plans. ¶¶ 28-29, supra.;

d.     Entering into a side letter agreement with a potential investor to give them significant observer seat access on the Company's Board without Company discussion, review, or approval, and thereafter misrepresenting he had previously obtained that approval. ¶¶ 30-32, supra.

e.     Directing an employee to pressure an IT employee away from releasing Sheehan's emails, which necessitated the placing of that IT employee on investigatory leave due to that refusal ¶¶ 34-35, supra.

f.    Falsely representing to an attorney who he engaged with the Company that he had Board support to remove the CEO and negotiate a severance package, which resulted in that attorney terminating his relationship with the Company when he learned those representations were false. ¶ 33, supra.

59.    Through these actions, Sheehan exceeded the scope of his authority and failed to act with a level of care that a reasonably prudent person would use in similar circumstances.

60.    Sheehan's actions have directly damaged the Company's operations, investor relations, and leadership integrity.

61.    Sheehan's actions have resulted in significant financial and reputation damage to the Company.

## COUNT III
## Breach Contract (Proprietary Information Agreement)

62.    Counter-Plaintiff repeats and realleges the allegations in the foregoing paragraphs as if fully set forth herein.

63.    Sheehan and the Company entered into the PIA on August 22, 2017.

64.    The PIA constituted a valid and enforceable contract.

65.    Section 1.1 of the PIA prohibits Sheehan from disclosing Proprietary Information

66.    Section 1.2 of the PIA defines "Proprietary Information" as "all confidential, trade secret and/or proprietary knowledge, data or information of the Company."

67.    The following items, among others, are specifically delineated as "Proprietary Information" under the PIA: "information regarding plans for research, development, new products, marketing and selling, business plans, budgets and unpublished financial statements, licenses, prices and costs, margins, discounts, credit terms, pricing and billing policies, quoting procedures, financing and capital raising plans, activities and agreements," "non-public

43

information regarding Company personnel," along with "any other non-public information that a competitor of the Company could use to the competitive disadvantage of the Company."

68.    Sheehan breached the PIA by, among other things, disclosing non- public, confidential information about the Company, the Company's Board of Directors, and the Company's business to both non-executive, unauthorized internal employees as well as third parties, including at least four investors. ¶¶ 28-29 supra

69.    Sheehan's breach of the PIA caused damages to the Company.

## <u>COUNT IV</u>
### Declaratory Judgement (Non-statutory Stock Option Agreement)

70.    Counter-Plaintiff repeats and realleges the allegations in the foregoing paragraphs as if fully set forth herein.

71.    Through the course of Sheehan's employment, Sheehan and the Company entered into two Nonstatutory Stock Option Agreements (see Exhibit B  and Exhibit C, respectively), which granted Sheehan the right to purchase shares  of Common Stock in the Company under certain circumstances.

72.    The Stock Agreements constituted valid and enforceable contracts.

73.    The Company has not breached any of its obligation under either Stock Agreement

74.    Section 3(e) of the Stock Agreement defines "Termination for Cause" as follow:

"Termination for Cause. If, prior to the Final Exercise Date, the Optionholder's status as a Service Provider is terminated by the Company for Cause (as defined below), the right to exercise this Option shall terminate immediately upon the effective date of such termination. If the Optionholder is party to an agreement with the Company that contains an applicable definition of "Cause", "Cause" shall have the meaning ascribed to such term in such agreement. Otherwise, "Cause" shall mean **willful misconduct by the Optionholder or failure by the Optionholder to perform the Optionholder's responsibilities to the Company** (including, without limitation, breach by the Optionholder of any provision of any employment, consulting, advisory, nondisclosure, non-competition or other similar agreement between the Optionholder and the Company), as determined by

44

the Company, which determination shall be conclusive. The Optionholder shall be considered to have been discharged for "Cause" if the Company determines, within 30 days after the Optionholder's resignation or termination other than for Cause, that discharge for Cause was warranted." (Emphasis added)

75.    Sheehan's actions, as detailed above and further enumerated below, constitute both willful misconduct and a failure by Sheehan to perform his responsibilities to the Company.

    a.    Falsely representing the Company's strategic and operational plans to a significant Company investor in order to improperly procure an investment from them on false pretenses. ¶¶ 26-27, supra.;

    b.    Making deliberate misrepresentations to at least four investors that Mr. Constantine would be stepping down as CEO, despite knowing the Board had made no decision to this effect. ¶ 29, supra.;

    c.    Disclosing non-public, confidential information to third parties, including at least four investors, about the Company, the Company's Board of Directors, and the Company's business plans. ¶¶ 28-29, supra.;

    d.    Entering into a side letter agreement with a potential investor to give them significant observer seat access on the Company's Board without Company discussion, review, or approval, and thereafter misrepresenting he had previously obtained that approval. ¶¶ 30-32, supra.

    e.    Directing an employee to pressure an IT employee away from releasing Sheehan's emails, which necessitated the placing of that IT employee on investigatory leave due to that refusal. ¶¶34-35, supra.

    f.    Falsely representing to an attorney who he engaged with the Company that he had Board support to remove the CEO and negotiate a severance package, which resulted in that attorney terminating his relationship with

the Company when he learned those representations were false. ¶33, supra.

76.    On December 30, 2025, the Board voted to terminate Sheehan's employment for Cause and remove him as an officer. On January 9, 2025, the Common Stockholders voted to remove Sheehan from the Board.

77.    Accordingly, an actual controversy exists between the parties which is ripe for adjudication.

78.    Under the Declaratory Judgement Act, this court is authorized to "declare the rights and other legal relations of any interested party seeking such declaration."   28 U.S.C. § 2201(a).

79.    The Company is therefore entitled to a judicial determination of the Company's rights and obligations under the Stock Agreements.

**WHEREFORE,** Counter-Plaintiff respectfully requests that the Court enter an Order:

    a.    Requiring Sheehan to pay the Company damages for his breach of contract and breaches of fiduciary duty;

    b.    Declaring Sheehan's unvested options terminated due to his termination for Cause;

    c.    Awarding Counter-Plaintiff its costs, fees and expenses;

    d.    Pre-and-post judgement interest;

e.    Granting such other and further relief as the Court deems just and proper.

**FOX ROTHSCHILD LLP**

By: *Bret Berman*

Bret Berman, Esq.
Fox Rothschild LLP
Two Commerce Square
Suite 1700
Philadelphia, PA 19103

Joseph D. D. Sweeny, Esq.
Fox Rothschild LLP
101 Park Avenue
17th Floor
New York, NY 10178

***LEWIS BRISBOIS BISGAARD & SMITH LLP***

By: */s/ Elior D. Shiloh*
Elior D. Shiloh
Abaigeal D. Franson
*Attorneys for Defendant*
77 Water Street, Suite 2100
New York, New York 10005
212-232-1300
Elior.Shiloh@lewisbrisbois.com
Abaigeal.Franson@lewisbrisbois.com

*Attorneys for Defendant,*
*Air Company Holdings, Inc.*

Dated:  June 13, 2025